UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION OF FRANKFORT
CASE NO. 3:18-CV-23-GFVT


KELSEY LOVE                                    PLAINTIFF


VS.              *VIDEO DEPOSITION OF*
                  *DR. THOMAS D. FOWLKES*


FRANKLIN COUNTY, KENTUCKY, et al.

                  DEFENDANTS/THIRD-PARTY PLAINTIFFS

VS.

SOUTHERN HEALTH PARTNERS, INC.

                            THIRD-PARTY DEFENDANTS

* * * * * * * * * *

    The video deposition of DR. THOMAS D.

FOWLKES was taken before Stephanie A. Blanton,

Certified Court Reporter and Notary Public in

and for the State of Kentucky at Large, via Zoom

video conference on Tuesday, May 19, 2020

commencing at the approximate hour of 1:32 p.m.

Said deposition was taken pursuant to Notice,

heretofore filed, to be read and used on behalf

of the Defendants/Third-Party Plaintiffs at the

trial in the above-captioned action and all

other purposes as permitted by the Kentucky

Rules of Civil Procedure.

                  * * * * * * * * * *


Stephanie A. Blanton, CCR
An/Dor Reporting & Video Technologies, Inc.

2

APPEARANCES:


 Hon. Paul Harnice
Hon. Sarah J. Bishop
STOLL KEENON OGDEN, PLLC
201 West Main Street, Suite A
Frankfort, Kentucky  40601

COUNSEL FOR THE DEFENDANTS/THIRD-PARTY
PLAINTIFFS


Hon. Margaret Jane Brannon
JACKSON KELLY, PLLC
City Center, Suite 700
100 West Main Street
Lexington, Kentucky  40507

COUNSEL FOR THE THIRD-PARTY DEFENDANTS


Hon. Aaron Bentley
BELZLEY, BATHURST & BENTLEY
P.O. Box 278
Prospect, Kentucky  40059

COUNSEL FOR THE PLAINTIFF


ALSO PRESENT:

Angela Edwards, Video Technician
Ashley Frye

3

I N D E X

WITNESS: DR. THOMAS D. FOWLKES                    PAGE(S)

COLLOQUY ................................... 4-6

EXAMINATION
        By Mr. Harnice...................... 6-173

        By Mr. Bentley ................... 173-213

COLLOQUY .............................. 213-214


SIGNATURE PAGE ............................ 215

REPORTER'S CERTIFICATE .................... 216

* * * * * * * * * *

E X H I B I T   I N D E X

| Exhibit | Description | Page(s) |
|---|---|---|
| Number 36 | Notice of Deposition | 9 |
| Number 37 | Dr. Fowlkes' Curriculum Vitae with watermark | 18 |
| Number 38 | Dr. Fowlkes' Curriculum Vitae without watermark | 18 |
| Number 39 | Dr. Fowlkes' report | 18 |
| Number 40 | Dr. Fowlkes' list of cases | 19 |
| Number 41 | Dr. Fowlkes' fee schedule | 19 |

4

```
 1    VIDEO TECHNICIAN:  This deposition will be taken

 2                      by a stenographer, as well as

 3                      recorded by video by the court

 4                      reporter using Zoom's

 5                      recording function which will

 6                      be considered the official

 7                      video copy for the record.

 8                      Counsel for plaintiff and

 9                      counsel for defendant will be

10                      attending via Zoom video

11                      conference.  As the court

12                      reporter will also be

13                      attending remotely, the

14                      deponent will be sworn in

15                      remotely pursuant to recent

16                      legislation permitted

17                      this.  We are on the video

18                      record.  I'm Angela Edwards,

19                      the video technician.  The

20                      court reporter is Stephanie

21                      Blanton.  We're here today to

22                      take the deposition of

23                      Dr. Thomas Fowlkes.  This

24                      deposition is being taken
```

5

```
 1                    pursuant to notice in the U.S.
 2                    District Court at Frankfort,
 3                    Kentucky, styled Kelsey Love,
 4                    et al. versus Franklin County,
 5                    Kentucky, et al.  The date is
 6                    May 19th, 2020.  The time is
 7                    1:32 p.m.  Counsel will now
 8                    introduce themselves and state
 9                    who they represent, please.
10    MS. BISHOP:     Sarah Bishop and Paul Harnice,
11                    for Defendants Franklin
12                    County, Kentucky, Rick Rogers,
13                    Michael Phillips, Anthony
14                    Pullen, Timothy Harrod, Brandi
15                    Upton, John Ringer, Jeff
16                    Abrams, and certain John and
17                    Jane Doe defendants.
18    MR. BENTLEY:    Aaron Bentley, here on behalf
19                    of Ms. Love.
20    MS. BRANNON:    Jane Brannon, on behalf of
21                    Southern Health Partners.
22    COURT REPORTER: Dr. Fowlkes, would you please
23                    raise your right hand?  Do you
24                    swear or affirm the testimony
25                    you're about to give will be
```

6

1                          the truth, the whole truth,

2                          and nothing but the truth?

3     THE WITNESS:        I do.

4                          *  *  *  *  *  *  *  *  *

5                          EXAMINATION

6     By Mr. Harnice:

7     Q    Dr. Fowlkes, my name is Paul Harnice, and I

8          represent the--the people and entities that

9          Ms. Bishop just explained.  You can't see

10         me because Ms. Bishop is going to run the

11         computer.  And we are social distancing, so

12         I am asking questions from afar here.  If

13         for any reason--yesterday we had a

14         deposition and the deponent remarked that

15         she wasn't able to see me.  For any reason

16         throughout this deposition you--which I

17         can't foresee it happening, but if you want

18         to see me then just ask us and Ms. Bishop

19         will turn--turn the--the video towards me.

20         I'll tell you in advance that's probably

21         something that you're not going to want to

22         do.  Have you ever given a deposition

23         before?

24    A    I--I--before I answer I'll just tell you

25         right there at that moment you--you

7

1        became--became staticky.  I'm not sure if

2        it was just my--my connection or--

3    MS. BRANNON:      No.  My connection you--you--

4    MR. HARNICE:      Okay.

5    MS. BRANNON:      --staticked out as well.

6    Q    Let me--can you--how's this?

7    A    I can hear you fine.

8    Q    Have you ever given a dep--deposition

9        before?

10   A    I have.

11   Q    How many times?

12   A    As a--as an estimate, I would say a couple

13       dozen.

14   Q    Okay.  I want to go over a few rules that

15       you're probably aware of but just to make

16       sure we're on the same page.  I'm going to

17       be asking you questions to which you will

18       be giving responses hopefully.  If you

19       don't hear like just what happened, if

20       it--if it gets staticky or you're not one

21       hundred percent certain of the question I

22       asked you, just ask me to restate it; fair

23       enough?

24   A    It is.

25   Q    And if I ask you a question that you don't

8

1          understand or that is confusing to you, ask

2          me to restate it; fair enough?

3    A     It is.

4    Q     If I ask you a question to which you give a

5          response, we are going to assume that you

6          both heard and understood the question and

7          gave a--a response--response according

8          thereto; fair enough?

9    A     That's fair enough with the caveat that

10         obviously I thought I heard the question

11         and I thought I understood it, so--

12   Q     Well, that's my whole point here.  If there

13         is any doubt in your mind, if there's a one

14         percent doubt that you--you may not have

15         heard it or you may not have understood it,

16         then let's go through the process again,

17         because what I don't want to have happen is

18         if there's a trial of this matter is for

19         you to come in and say, well, no, I

20         didn't--I didn't hear that or understand

21         that to be the question on May 19th of 2020

22         and so there's some confusion here.  So I

23         want to make sure when we leave here today

24         there aren't those kind of issues; fair

25         enough?

9

1    A    Well, it's fair enough that I will tell you

2         to--to the extent that I believe that there

3         are those issues I will certainly tell you.

4    Q    That's what--that's all I can ask of you.

5         But I'm asking you to--to air on the side

6         of telling me versus keeping it to

7         yourself; fair enough?

8    A    It is.

9    Q    All right.  What did you do to prepare for

10        this deposition?

11   A    I reviewed my Rule 26 report and the case

12        documents in this matter.

13   Q    Okay.  And when you say the case documents,

14        are those the documents that I believe you

15        listed at the back of your report?

16   A    That is correct.

17   MR. HARNICE:      Okay.  I'm going to show you

18                     what I'm going to mark as

19                     Exhibit Number 36 to these

20                     depositions.  And I'll tell

21                     you this is the notice of

22                     dep--of your deposition here

23                     today.

24   MS. BISHOP:    Just one second.

25   MR. HARNICE:    Give us one second.

Stephanie A. Blanton, CCR
An/Dor Reporting & Video Technologies, Inc.

10

1          (NOTICE OF DEPOSITION IS MARKED AS EXHIBIT

2          NUMBER 36 FOR PURPOSES OF IDENTIFICATION

3          AND THE SAME IS ATTACHED HERETO AND FILED

4          HEREWITH)

5    By Mr. Harnice:

6    Q    Have--have you--and we'll scroll down.  If

7         you need us to stop--

8    MS. BISHOP:        No.  That's not it.  Sorry.

9    MR. HARNICE:       Yeah.  So sorry about that.

10   MS. BISHOP:        Just checking you.

11   Q    She's just making sure we're paying

12        attention.  This is the only bad thing

13        about these remote depositions frankly

14        is--is kind of having to wind our way

15        through the--getting the document--now here

16        we go.  Now, this one I'll tell you we've

17        marked as Exhibit Number 36 to these

18        depositions.  It is the notice of videotape

19        deposition of Dr. Thomas Fowlkes.  Have you

20        seen this document?

21   A    I have not.

22   Q    SHP's counsel did not share this with you?

23   A    They did not.

24   Q    Well, let's go down--this was filed in the

25        record and it, right there Sarah, it says,

11

1     the witness is directed to produce and

2     bring to the deposition the following

3     documents.  And if you go down, there are

4     certain documents.  I guess the way I'll

5     handle this now since you haven't seen this

6     document is, are there any documents that

7     you relied upon in forming your opinions in

8     this cases--in this case other than those

9     documents that are listed in your report on

10    page 26 of 37 where you say the facts or

11    data considered by the witness [inaudible]

12    his opinions, and you say, to assist me in

13    forming these medical opinions I've

14    reviewed records in this case, including,

15    and it starts with Number 1, the complaint,

16    and goes all the way down through Number 8,

17    expert reports of Stephen Hall and Mr. Ed

18    Sweeney.  Are those all the documents that

19    you--you looked at in forming your opinion

20    in this--in this case?

21  A   They are.  I--they--specifically all the

22    documents that Ms. Brannon--only the

23    documents that Ms. Brannon has provided to

24    me, and I don't believe she has provided me

25    with additional documents since the

12

1    preparation of the Rule 26 report.  But

2    I--

3 Q  I think a better way to ask this is:

4    Are--within your report, have you listed

5    all documents upon which you base your

6    opinion--opinion in this matter?

7 A  I have.

8 Q  And are there any other documents that

9    you're aware of that you used to form your

10   opinion in this matter other than those

11   listed in your report?

12 A  Well, only to--as I just said, only to the

13   extent that Ms. Brannon has sent me

14   additional documents since the filing of my

15   report, which I don't believe that she has.

16 Q  Okay.  So I'll remember when we get to your

17   report, page 26 of your report, I'll

18   remember to ask you to take a look at that

19   list and to tell me if you're aware of any

20   other documents Ms. Brannon has sent you

21   for review for this report; is that fair

22   enough?

23 A  Yes.  Al--although it would not be for this

24   report; it would be--what I'm talking about

25   is subsequent to this report.  And I--I

13

1    don't--I think the answer to all of those

2    is none, but I'm just telling you that

3    these were the documents I reviewed at the

4    time of my report, and I don't believe

5    she's sent me any since.

6  Q  Well, I'll ask you that when we get to it

7    all the same because what's really

8    important to me here today and the reason

9    the notice is phrased as it is is I just

10   want to make sure I'm aware of every single

11   document that you reviewed in order to form

12   your opinions in this matter and if there's

13   documents other than what's listed on page

14   26 of your report I'm going to ask you

15   [inaudible].  Did you hear me?

16 A  I--I heard you--I heard a statement.  If

17   you had a question at the end of it, I

18   didn't get--did not hear a question.

19 Q  I--I just asked you:  Is that fair enough?

20 A  Yes.

21 Q  Okay.  Okay.  Let me show you what I'll

22   mark as Exhibit Number 37 to the

23   depositions in this matter.  And what I'll

24   tell you is that in the SHP defendant's

25   expert disclosure that was filed in this

14

1     matter there are actually two curriculum

2     vitaes that were attached to that pleading.

3     One of them had a watermark across it that

4     said expert not retained, and then the

5     other one did not have that watermark on

6     it.  So what I'm going to ask you about

7     absent Ms. Brannon telling me otherwise is

8     I'm going to ask you about your curriculum

9     vitae that does not have the watermark on

10    it, and we will introduce that as the

11    exhibit in this case.  Is that okay with

12    you?

13  A   It--it is okay, but I will tell you that

14    the curriculum vitae which I submitted with

15    this report did not have a watermark and is

16    dated as updated 10/8 of 2019.  That's the

17    one I submitted.  I did not submit a CV

18    with the watermark.

19  MR. HARNICE:    Jane, do you want to

20               clear--clear us up on that?

21               You know what I'm talk--the

22               issues I'm talking about here;

23               right?

24  MS. BRANNON:    Yeah.  I--I don't know how the

25               one that has a watermark on it

15

```
 1                        got produced, and I certainly
 2                        didn't put a watermark on one.
 3                        So I don't know where it would
 4                        have come from.
 5   MS. BISHOP:          I can--
 6   MS. BRANNON:         Are they different?
 7   MS. BISHOP:          Okay.  Well, here's--here's
 8                        the one--
 9   MS. BRANNON:         Well, other--other--other than
10                        the watermark, are they
11                        different?
12   THE WITNESS:         I--I can probably explain.
13   MS. BRANNON:         Okay.
14   A    So Number 1, I do update my CV regularly,
15        and the date at the bottom would be the
16        date that is when that was updated.  So if
17        you'll keep scrolling there you'll see that
18        one says it's updated 6/12 of 2017.  And so
19        that is a--a CV that as of, you know, 2017,
20        2018 was on my website because I--I always
21        put that watermark so someone will not
22        download it and then say that I'm an expert
23        in their case.  So maybe Ms. Brannon's
24        office had that from before they retained
25        me or--or whatever, I don't know, but the
```

16

```
 1          one that I submitted with my report is the
 2          one that's dated 10/8 of 2019 and has no
 3          watermark.  And that is my current CV.
 4          That is the most recent update of my CV.
 5   MR. HARNICE:        And, Jane, to answer your
 6                       question, there are
 7                       differences.
 8   MS. BRANNON:        Well, it would be--it would be
 9                       explained by the fact that
10                       they're from two different
11                       dates I would think, Paul.
12                       You're welcome to ask him
13                       about both of them if you want
14                       to, but--
15   MR. HARNICE:        I don't [inaudible]--I'm--I'm
16                       just--
17   MS. BRANNON:        So I--I don't know that it's
18                       going to be anything of
19                       significance, but--
20   MR. HARNICE:        No.  Jane--
21   MS. BRANNON:        --you're the one to determine
22                       that.
23   MS. BRANNON:        You're missing the point,
24                       Jane.  I'm just answering your
25                       question.  You asked are there
```

17

```
 1                        any differences, and he went

 2                        through the fact that he

 3                        updated.  I'm just answering

 4                        your question that, yes, there

 5                        are differences.

 6    MS. BRANNON:        Well, I took that from what

 7                        Dr. Fowlkes said, Paul.  So

 8                        does that satisfy your

 9                        curiosity, or are we going to

10                        have to thrash around about a

11                        CV for 20 more minutes?

12    MR. HARNICE:        No, we're not going to have to

13                        thrash around but I'm not the

14                        one that filed two of them in

15                        the record.

16    MS. BRANNON:        Well, I wish that I were

17                        as--as up to speed on

18                        everything as you, Paul.  I

19                        made a mistake--

20    MR. HARNICE:        Well--

21    MS. BRANNON:        --and I--and I really hate

22                        that for everybody.  Can we

23                        just move on to something of

24                        merit?

25    MR. HARNICE:        Yes.  So what I'm going to
```

18

1          mark is--I will mark as

2          Exhibit Number 37, I think is

3          where we we are at, I'm going

4          to mark as Exhibit Number 37

5          the--the page that--what was

6          filed in the record as pages 1

7          of 4, which is Dr. Fowlkes' CV

8          with the watermark on it,

9          expert not retained, which was

10         updated 6/12 of 2017.  So

11         that's Exhibit Number 37.

12         Exhibit Number 38 is going to

13         be Dr. Fowlkes' CV dated

14         June 8th of 2019, which is

15         pages 28 through 33 of 37 in

16         the pleading that was filed in

17         the court.  And then 39 will

18         be his report.  40 will be his

19         list of cases.  And 41 will be

20         his fee schedule.  Just to

21         amend.

22     (DR. FOWLKES' CURRICULUM VITAE WITH

23   WATERMARK IS MARKED AS EXHIBIT NUMBER 37;

24   DR. FOWLKES' CURRICULUM VITAE WITHOUT

25   WATERMARK IS MARKED AS EXHIBIT NUMBER 38;

19

1    DR. FOWLKES' REPORT IS MARKED AS EXHIBIT

2    NUMBER 39; DR. FOWLKES' LIST OF CASES IS

3    MARKED AS EXHIBIT NUMBER 40; AND

4    DR. FOWLKE'S FEE SCHEDULE IS MARKED AS

5    EXHIBIT NUMBER 41 FOR PURPOSES OF

6    IDENTIFICATION AND THE SAME IS ATTACHED

7    HERETO AND FILED HEREWITH)

8  By Mr. Harnice:

9  Q    So Exhibit Number 37, let me--let me show

10      you that, Dr. Fowlkes.

11 MS. BISHOP:      37.

12 Q    Exhibit Number 37 is the watermark, expert

13      not retained, CV.  And ask you if you

14      recognize this document?

15 A    I do.

16 Q    And that appears to be, based upon what

17      you've told us, your CV that was updated as

18      of June 12th of 2017; is that correct?

19 A    I think it said June 20th, but--no, I'm

20      sorry.  June 12th.  That's correct.  Yes.

21 Q    All right.  We'll mark that as Exhibit 37.

22      And do you know what date Ms. Love had her

23      baby in this matter?

24 A    I do.

25 Q    What was that date?

20

1   A    May the 16th of 2017.

2   Q    So it looks like Exhibit Number 37 was

3        updated 26 days after the birth of

4        Ms. Love's child; is that correct?

5   A    I'll trust your math.

6   Q    Okay.  And now next I'll show you what I'll

7        mark as Exhibit Number 38, which is pages

8        28 through 33 of 37, which is your CV

9        without a watermark and was last updated

10       October 8th of 2019; is that correct?

11  A    That is correct.

12  Q    So is it your testimony that you never

13       provided Exhibit Number 37 to Ms. Brannon?

14  A    No.

15  Q    You--you did not, or--

16  A    That's not my testimony.

17  Q    All right.  Did you provide Exhibit Number

18       37 to Ms. Brannon?

19  A    I don't know.

20  Q    Did you provide Exhibit Number 37 to

21       Southern Health Partners?

22  A    I do not know.  Which one--the one with the

23       watermark?

24  Q    Exhibit Number 37, yes, the watermark.

25  A    I don't know.

21

1  Q    Okay.  And is it your testimony that you

2       don't have any idea of how Exhibit Number

3       37 made it into the record in this case?

4  A    No, that's not my testimony.

5  Q    Do you know how Exhibit Number 37 made it

6       into the record in this case?

7  A    No, I do not know, but I have an idea.  You

8       asked me if I had an idea.

9  Q    What is your idea?

10 A    That it was a CV which they had in their

11      file from either--which they obtained from

12      my website or possibly which I sent to them

13      some time ago on this or another case and

14      they had it in their file and they

15      submitted it with the report.

16 Q    When you refer to they and them, who are

17      you referring to?

18 A    Ms. Brannon and/or her firm.

19 Q    Okay.  All right.  Let's go to Exhibit

20      Number 38, which is the version of your CV

21      last updated on October 8th of 2019.  Is

22      this the most recent CV that you have?

23 A    It is.

24 Q    Do you have--before I begin asking you

25      questions about it, do you have any changes

22

1      or modifications to it?

2   A   Certainly not any substantive

3      modifications.  I am about to prepare a new

4      one because I have recently renewed my

5      certified correctional health care

6      professional certification and my

7      Mississippi license for another year.  So

8      I'm about to update a new one and those

9      changes have not been--I just haven't

10     submitted a new CV yet or updated my CV.

11  Q   Do you have any substantive changes to

12     Exhibit Number 38?

13  A   No.

14  Q   All right.  Did you prepare Exhibit Number

15     38?

16  A   That's the CV?

17  Q   Correct.  Exhibit Number 38 is your

18     October 8th, 2019 CV.  Did you prepare it?

19  A   I did.

20  Q   So if you look at the top of page 1 of 5 of

21     your CV under Summary Qual--Qualifications

22     where it says [inaudible], is that how you

23     describe yourself?

24  A   It is.

25  Q   And if you look in the second paragraph

23

1    where it says, accomplished expert witness,

2    is that how you describe yourself?

3  A    It is.

4  Q    It appears to me that you went to medical

5    school at the University of Tennessee; is

6    that correct?

7  A    That is correct.

8  Q    And did you get a good education at the

9    University of Tennessee medical school?

10  A    Well, that--in my opinion, I--I did.  I

11    guess other people might differ with

12    whether a medical school education at

13    University of Tennessee is better or worse

14    than one at the University of Kentucky or

15    some other school.  But I--I believe it was

16    a good education.

17  Q    And did you rely upon your education at the

18    University of Tennessee in forming your

19    opinions in this case?

20  A    That's a very broad question and I don't

21    know that I could point to any particular

22    thing, but in general I relied on my

23    education as a physician, my residency

24    training, my board certifications.  So all

25    of those things together, yes, I relied on

24

1           them.

2    Q      If you go down under Summary of

3           Qualifications, Areas of Expertise, do you

4           see those?

5    A      I do.

6    Q      Is there any--do you have any--in any of

7           those five line items under Areas of

8           Expertise, did--do any of those involve

9           prenatal care?

10   A      Well, certainly emergency medicine involves

11          the care of pregnant women; yes.

12   Q      And is that a situation where--by emergency

13          medicine do you mean you were working in an

14          emergency room and women would come into

15          the emergency room to deliver their babies?

16   A      Well, most often--most hospitals don't

17          deliver babies in the emergency department.

18          Most hospitals that have obstetrical

19          services have a separate labor and delivery

20          unit.

21   Q      So what role would--if you were working in

22          an urgent care and emergency medicine, what

23          role would you play if a lady came in the

24          emergency entrance to have her baby?

25   A      Well, so that's a separate question than

25

1    taking care of pregnant women, but if--what

2    role would I play if they were coming into

3    the emergency department to have their

4    baby, it would depend on whether the baby

5    was precipitously being delivered or

6    whether they had time to be transferred to

7    labor and delivery, whether there was an

8    obstetrician onsite or whether there was

9    not.

10  Q    And how many babies have you delivered in

11       your career?

12  A    As part of my medical school and residency

13       training, I--I don't know an exact number,

14       I would say somewhere on the order of 15 to

15       20.

16  Q    And was that back when you--in the, I

17       guess, late '80s and early 1990s?

18  A    That is correct.

19  Q    Have you delivered a baby since you

20       were--completed your residency?

21  A    Well, the answer to that is yes.  And

22       delivering a--the answer to that is yes,

23       but it has been more than ten years or so

24       ago.  So in emergency departments, if one

25       works in the emergency department for any

26

```
 1        length of time, they'll be precipitous

 2        deliveries or deliveries which occur in

 3        the--in the emergency department, in a car,

 4        in the hallway.  And some of those are at

 5        various stages of pregnancy.  So in other

 6        words, some of them very early, essentially

 7        spontaneous abortion.  But--

 8   Q    What year did you complete your residency?

 9   A    1992.

10   Q    How many--after completion of your

11        residency, how many babies have you

12        delivered?

13   A    I--I don't know, but it--I do not know.

14        It's single digits.

15   Q    What other--

16   A    It also depends on--I--I don't understand

17        your question entirely because the delivery

18        of a fetus, I'm not counting that.

19        And--and that would be a much higher number

20        because emergency departments deal with

21        that regularly.

22   Q    And what--

23   A    So I--

24   Q    Explain to the ladies and gentlemen of the

25        jury what the dif--difference is between
```

27

```
 1            the delivery of a baby and the delivery of

 2            a fetus?

 3    A       Well, as a very simple definition, it is

 4            the time of viability.  So around 24 weeks.

 5            So in other words, a non-viable fetus

 6            that's stillborn at 18 weeks is--is a

 7            different matter than a viable fetus which

 8            is born at 24, 26 weeks or later.

 9    Q       Since the completion of your residency, how

10            many fetuses have you delivered?

11    A       I do not know.

12    Q       Do you have even a guesstimate?

13    A       Twenty or more, I would say.

14    Q       In what year did you most recently deliver

15            a fetus?

16    A       More than 12 years ago.

17    Q       You're a medical doctor; is that correct?

18    A       That is correct.

19    Q       Would you explain to the ladies and

20            gentlemen of the jury, what is the

21            difference between a medical doctor and an

22            OBGYN?

23    A       I'm not certain I--I understand your

24            question since most ob--obstetricians are

25            medical doctors.
```

28

1  Q    Well, that's fair enough.  An OBGYN is also

2       a medical doctor; correct?

3  A    That is correct.

4  Q    And after becoming a medical doctor, what

5       does an individual have to do to then

6       be--become an OBGYN?

7  A    Well, it would depend on the specific

8       state, but essentially they wouldn't have

9       to do anything other than declare they were

10      an OBGYN.  In most cases, that is not

11      occurring in this day and age.  Most people

12      who are going to be OBGYNs do a residency

13      now.

14 Q    Is an OBGYN considered a specialist?

15 A    Obstetrics and gynecology is one of the

16      specialties of medicine; yes.  That's

17      correct.

18 Q    And is being an M.D. considered a

19      specialist?

20 A    No.  Being a--a medical doctor is

21      a--is--means that you've been to medical

22      school and have passed your basic medical

23      licensure or training.  So everyone who is

24      any type of specialist is a medical doctor.

25      Of course, there are other--there are other

29

1    ways you can become a medical doctor also,

2    such as going to a school of osteopathy.

3  Q   Are you a fellow of the American College of

4    Obstetrics and Gynecology?

5  A   I am not.

6  Q   Have you ever been licensed to practice

7    medicine in the Commonwealth of Kentucky?

8  A   I have not.

9  Q   What states have you been licensed to

10    practice medicine in?

11  A   Mississippi, Tennessee and Pennsylvania.

12  Q   If you look at the certifications on

13    Exhibit Number 38, do you have any--I asked

14    you this earlier but to be clear, you

15    mentioned you were going through--you're

16    going to update some certifications.  But

17    do you have anything to add to that list?

18  A   No.

19  Q   Is anything within that list other than

20    being a certified emergency physician

21    relate at all to the delivery of fetuses?

22  A   To the delivery of fetuses?

23  Q   Or [inaudible]--

24  A   Well, I--that certainly can happen in a

25    correctional health care setting, so I'm a

30

```
 1        certified correctional health care
 2        professional.  And certainly the delivery
 3        of fetuses can occur in any setting, as can
 4        delivery of babies.  I don't know that any
 5        of those specifically address that.
 6   Q    Was there any part of that certification
 7        that involved you having a certain level of
 8        expertise on the delivery of fetuses in a
 9        correctional setting?
10   A    I--I don't recall that.
11   Q    If you go down to your professional
12        experience, do you see that?
13   A    I do.
14   Q    It appears that from 1998 to present in the
15        line item that says medical director at
16        Lafayette County (MS) Detention Center, the
17        top one.
18   A    Yes.  I--I'm sorry.  I didn't hear a
19        question.
20   Q    The very first--under Professional
21        Experience, the very first entry there says
22        1998 to present, medical director at
23        Lafayette County Detention Center, do you
24        see that?
25   A    I do.
```

31

1    Q    And it says from 19--the second sentence,

2         from 1998 to 2015 as an independent

3         contractor responsible for provision of all

4         medical, nursing, medication and lab

5         services at the facility.  Is that--does

6         that include the complete list of what you

7         did within that facility?

8    A    No.

9    Q    What else did you do within that facility?

10   A    That is a summary of my major job

11        descriptions.  I did a lot of other things,

12        but I--I don't recall them specifically.

13        But that is a summary of my job duties.

14   Q    So at this particular facility in Lafayette

15        County, Mississippi, you were an onsite

16        medical doctor at the facility; is that

17        correct?

18   A    That is correct.

19   Q    How many hours a week would you work at the

20        facility?

21   A    I can't give you an answer for at the

22        facility, but I am employed 168 hours a

23        week.

24   Q    Well, of those 168 hours per week, in a

25        typical week how many hours would you

32

1     actually be at the facility?

2  A   Number one, I--I don't know what time

3     frame--are you referring to the 1998 to

4     2015 time frame; is that correct?

5  Q   Correct.

6  A   I cannot give you an answer specifically.

7  Q   Well, so you're still doing that presently;

8     correct?

9  A   Well, I'm--I'm employed by the county now.

10 Q   And how many--are you still working 168

11    hours now per week?

12 A   I am.

13 Q   Let's say last week, how many hours were

14    you physically at the facility?

15 A   I couldn't give you a precise answer.  I

16    could give you a precise answer--I mean,

17    I--I cannot give you a precise answer about

18    any week, including last week.  I would say

19    last week it was something on the order of

20    ten or so at one facility.

21 Q   What did you do the other 158 hours?

22 A   I was on-call.  I took telephone calls, I

23    consulted on the phone.  So I was available

24    for calls, and I went to the jail three or

25    four times last week.  We're under a--a

33

1    quarantine order now, so we have less

2    movement, we have less population, we don't

3    have any visitors.  So my actual

4    involvement at the facility is--you know,

5    is limited to only the--that's necessary.

6    And the rest of the time I'm consulting by

7    telephone, available for call, available

8    for emergencies.  We had--of which we had a

9    couple last week.

10   Q    And when--you mentioned you were on-call.

11        Is that a term that's frequently used in

12        the medical industry?

13   A    It is.

14   Q    And tell the ladies and gentlemen of the

15        jury what being on-call means to you.

16   A    It means that I am available via phone.

17        And in most cases, available for in-person

18        response when needed.

19   Q    When--you say in most cases.  What would be

20        an example of when you would not be

21        available for in-person duty?

22   A    During the period of time in which I'm

23        testifying in a deposition.

24   Q    So if you were called with an emergency

25        here during this deposition, you would tell

34

1       them, I'm going to finish this deposition

2       and I can't come to the jail to take care

3       of the emergency?

4  A   Yes, that is correct.

5  Q   Who would handle the emergency?

6  A   Well, my nurse or my nurse practitioner

7       and/or emergency medical services.  So they

8       always have the opportunity or the option

9       to call the ambulance.  So most likely, we

10      would send the person to the hospital to be

11      evaluated there in the emergency

12      department.

13  Q   So if--your testimony is to the ladies and

14      gentlemen of the jury if you're unavailable

15      to go to the hospital you would air on the

16      side of calling the ambulance--I mean, I'll

17      strike that.  Your testimony--let me--let

18      me pause because we have to dub these

19      tapes.  So I apologize.  So your testimony

20      to the ladies and gentlemen of the jury is

21      that if during this deposition you were

22      called for an emergency at--for medical at

23      the Lafayette County Detention Center that

24      you would be unavailable to attend that and

25      then you would air on the side asking that

35

1    the ambulance be called to come to the

2    detention center; is that correct?

3  A  Well, so as you phrased the question it

4    being an emergency, yes.  Now, if--if I'm

5    just called about a--a medical situation, I

6    might determine that it is either urgent,

7    non-urgent, or emergent.  So in many more

8    cases I would not tell them to call an

9    ambulance than I would to call an

10   ambulance.  But you have used the--the term

11   emergency, and, yes, if it's an emergency I

12   would expect the correctional officers or

13   my nurses to call an ambulance.

14 Q  And the--does the Lafayette County

15   Detention Center have medical staff present

16   in the facility 24 hours a day, 7 days a

17   week?

18 A  They do not.

19 Q  What time periods of the day do they not

20   have medical staff present?

21 A  Essentially, the nighttime hours.  It

22   varies from day to day.

23 Q  And during those particular hours when

24   there's no staff physically present at the

25   jail, are you still on-call?

36

1    A    I am.

2    Q    And if you were called about a situation

3         during hours when there are no staff

4         present at the jail, do you typically take

5         it upon yourself to go to the jail if

6         you're on-call?

7    A    Typically, you--you--you're--I don't know

8         there is an answer to typically but more

9         often than not I do not go to the jail,

10        I--many more times than not when I'm

11        called.

12   Q    And if you don't go to the jail, has there

13        ever been a situation where you advised the

14        jail just to call an ambulance?

15   A    There has.

16   Q    And give the ladies and gentlemen examples

17        of when--let's say at 5:15 in the morning

18        there's no medical staff at the jail, the

19        jail calls you with a particular situation,

20        you make a determination you're not coming

21        into the jail at 5:15 and you instructed

22        them [inaudible]--

23   A    What was the last--

24   MS. BRANNON:      You--

25   A    The last of your--

                                                                    37

1    MS. BRANNON:        --you broke up, Paul.

2    A    The last of your question broke up.  I did

3         not understand it.

4    Q    Okay.  If you would, give the ladies and

5         gentlemen of the jury examples of a

6         situation where at 5:15 a.m. in the

7         morning, let's say, there is no jail staff

8         at the jail, you receive a call from the

9         jail because you're on-call, and you

10        instruct the jail to call an ambulance to

11        come to the jail versus you going to the

12        jail in-person.

13   A    Okay.  So you're asking me a--a

14        hypothetical regarding I am called.  Not my

15        nurses--more typically, my nurse would be

16        called first, not me.  But you're asking

17        for a hypothetical not relevant to the

18        facts of this case but that if I'm called

19        about something at 5:15 when might I tell

20        them to call an ambulance rather than me

21        going to the jail?  Is that your question?

22   Q    Right.  Just--just give the ladies and

23        gentlemen of the jury examples.

24   A    Okay.  If I were called at 5:15 in the

25        morning and was told that they had a person

38

1      just brought in and it appeared that they

2      had a stab wound to their chest, I would

3      more likely than not direct them to call an

4      ambulance rather than me going there to see

5      them.

6  Q   All right.  What--what else?  What other

7      examples?

8  A   If there were a--I'll give you another

9      example that if there is a person that I'm

10     aware of at the jail that has a history of

11     cardiac disease, coronary artery disease

12     and we have been managing their medications

13     and their angina and I'm called about them

14     having recurrent chest pain that is not

15     responsive to nitroglycerine, I would

16     likely tell them to go ahead and send the

17     person to the hospital.

18 Q   What if the jail called you at 5:15 in the

19     morning and said, we have a pregnant female

20     here who is complaining of back and leg

21     pain and we need to know what to do with

22     her?  What would you do under that

23     scenario?

24 A   So first of all, I want to just point out

25     that this is not similar to the facts of

39

1              this case in that I am a physician, I'm an

2              emergency physician; I'm not a nurse.  But

3              if I were called with that, I would ask

4              further questions such as whether there was

5              any bleeding, whether there was evidence of

6              contractions, whether there was passage of

7              the water, breaking the water.

8     Q     Would there ever be a situation where you

9              would come into the jail to observe that

10             pregnant inmate yourself?

11    A     I might or might not.  I--it would depend

12             on the exact circumstances.

13    Q     Let's go back to professional experience.

14             The third line item down, it says 2007 to

15             present you're a Prisoner Advocate member.

16             Tell the ladies and gentlemen of the jury

17             what you do as a Prisoner Advocate member.

18    A     Well, you didn't read what I was a member

19             of, but I am a member of the Institutional

20             Review Board at the University of

21             Mississippi.  And every research

22             institution that receives federal dollars

23             must have an Institutional Review Board to

24             review and approve of research projects

25             which involve human subjects.  And so I am

40

1      a member of that review board for the

2      University of Mississippi.  My particular

3      area of expertise and the reason that I was

4      asked to be on that is that if a research

5      institution is conducting any research

6      which involves prisoners, there must be a

7      person--a member of the Institutional

8      Review Board who has specific knowledge of

9      and expertise working with prisoners to

10      insure that any research which---which is

11      conducted on prisoners is in compliance

12      with federal rules about research involving

13      prisoners.

14   Q   Is--in that role on the Institutional

15      Review Board, is your title Prisoner

16      Advocate Member?

17   A   I--I believe that that is within the

18      federal regulations.  I did not--I did not

19      coin that term.  I--I believe that is my

20      official title, and I believe that may be

21      in federal regulations about the makeup of

22      Institutional Review Boards.

23   Q   But you don't know for sure?

24   A   I do not know for sure.

25   Q   Let's go over to page 3 of 5 of the Exhibit

41

1       Number 38.  I've asked you a little bit

2       about your education at the University of

3       Ten--Tennessee.  You also went to the

4       Univer--or attended the University of

5       Pittsburgh to complete your residency; is

6       that correct?

7    A  That is correct.

8    Q  All right.  Let me--if you go down to

9       Publications, which is at the bottom of--of

10      page 3 of 5 and extends on--actually, I'm

11      sorry.  Just--it looks like there--that you

12      have three publications; is that correct?

13   A  That's correct.

14   Q  Do any of your publications involve the

15      subject matter of caring for a pregnant

16      inmate?

17   A  They do not.

18   Q  If you go to page 4 of 5 where you have

19      Presentations/Teaching, do you see that?

20   A  I do.

21   Q  And that appears to extend over midway into

22      page 5 of 5; is that correct?

23   A  That is correct.

24   Q  Do any of your presentations or teaching

25      involve the care for a pregnant inmate?

42

1    A    Yes, I'm quite sure a number of them do.

2    Q    Can you tell me which ones do?

3    A    So number one, I'm not going to be able to

4         tell you specifically which of the--many of

5         these where I am--most of these lectures or

6         presentations involve drug abuse and drug

7         dependence.  Many of them involve--and

8         prescribing of controlled substances.  Many

9         of them involve addiction in pregnant women

10        and/or the treatment of them as part of the

11        presentation.  So in other words, it's

12        not--may not be a focus of those but in

13        many of these presentations I probably

14        discussed addiction medicine topics within

15        pregnant women.  In addition to that,

16        the--the top one is where I was an

17        instructor in a detention officer course

18        regarding those things, health care issues,

19        responding to medical emergencies in

20        special needs inmates in detention

21        facilities.  And that, of course, would

22        involve pregnant, as well as non-pregnant

23        detainees.

24   Q    Do you recall any of the parameters of your

25        teachings in that particular item?

43

1    A    I do not.

2    Q    Can you tell the ladies and gentlemen of

3         the jury anything that you recall that

4         may--that--that was a part of your

5         instruction there that in any way relates

6         to this case involving Ms. Love?

7    A    I cannot recite any specifics; no.

8    Q    All right.  What next on the list would

9         relate to the care of a pregnant inmate?

10   A    I--I believe that I--I summarized it in the

11        answer that I gave before, which was that

12        most of the rest of these presentations

13        involve addiction medicine.  Many

14        of--addiction medicine or prescribing of

15        controlled substances and many of them

16        included those topics in pregnant and in

17        non-pregnant patients.

18   Q    So my question is if you could tell the

19        ladies and gentlemen of the jury which ones

20        involve--or if you can, which ones involve

21        the care of a pregnant inmate?

22   A    I cannot.

23   Q    Did you--did you go back and look at any of

24        these before your deposition here today?

25   A    I did not.

44

1    Q    All right.  Next let me show you what I'm

2         going to mark as Exhibit Number 39.  And I

3         believe this is your report.  And it

4         extends 27 pages, if I'm not mistaken.  I

5         guess for the sake of making sure that I'm

6         working off the correct document,

7         it's--have--well, strike that.  Strike

8         that.  Do you have any reason to believe

9         that the document that's styled as your

10        report that is filed in the record as an

11        attachment to the pleading titled SHP

12        Defendant's Expert Disclosures is anything

13        other than your final report?

14   A    I do not.

15   Q    Before I begin asking you questions about

16        this report, do you have any amendments or

17        changes to it?

18   A    I do not.

19   Q    Does this report contain all of the

20        opinions that you intend to offer at the

21        trial of this matter?

22   A    It is a summary of the opinions that I have

23        formed and I think it--it adequately

24        surmises them.

25   Q    Well, what I want to be certain of is if

45

1      you--if there's another opinion that you

2      have out there that you think you may

3      ultimately testify about, I would like to

4      [inaudible]; fair enough?

5  A   It is fair enough.

6  Q   All right.  If you go to page 1 of your

7      report--

8  A   So I--I thought you were going to say--so

9      it is fair enough, and these are all the

10     ones that I have thought of and that I

11     intend to offer opinions about.  If you

12     would like to ask me specific questions, I

13     may have additional opinions but that

14     depends on your questions.

15 Q   Well, what I want to know, if you could

16     express all the opinions you want today,

17     what I'm most interested in is if you're

18     going to express an opinion that's not

19     contained in this report at the trial of

20     this matter I want to know about it today.

21     [Inaudible].

22 A   You're--you went staticky, but I believe I

23     understand.  What my answer--my answer to

24     that question is that it depends on what

25     questions I am asked at trial.

46

1    Q    Well, okay.  All right.  If you go down to

2         page 1, scope of your report, the--I'm

3         sorry.  The first lower case I, a complete

4         statement of all opinions the witness will

5         express and the basis and reasons for them.

6         And you've told us you don't have any

7         changes or additions to this current

8         report; correct?

9    A    That is correct.

10   Q    And then if you go down to the scope of the

11        report, it says Roman Numeral I, the

12        appropriateness of the medical care

13        provided to Ms. Kelsey Gabrielle Love

14        (Ms. Love) while she was incarcerated at

15        the Franklin County Regional Jail during

16        May of 2017.  Is that the first--did I read

17        that correctly?

18   A    You did.

19   Q    Have you reviewed the contract between

20        Southern Health Partners and Franklin

21        County regarding Southern--Southern Health

22        Partners' services at the jail?

23   A    I do not believe that it was part of the

24        documents that I reviewed.

25   Q    So as we sit here today, you have no idea

47

1    what contractual obligations SHP, Southern

2    Health Partners, may have had to the

3    Franklin County and Franklin County

4    Regional Jail?

5  A  That's not correct.

6  Q  Well, tell us what contractual obligations

7    you are aware of that are contained in the

8    contract between Southern Health Partners

9    and Franklin County Regional Jail.

10 A  Well, that wasn't your question that I said

11   that was incorrect.  You said I have no

12   idea about what contractual arrangement

13   they have.  I have an idea what a--a normal

14   contractual arrangement is between a county

15   and a--a private health care vendor.  So I

16   have a--an understanding of what they

17   normally are.  I have not reviewed the

18   contract in this specific case, I do not

19   believe.

20 Q  Okay.  Fair enough.  Do you have any

21   specific knowledge regarding the

22   contractual obligation that Southern Health

23   Partners had to Franklin County and the

24   Franklin County Regional Jail?

25 A  Well, yes, I have information from what I

48

1        reviewed within the case documents.

2    Q    That reference the contract?

3    A    No.  You asked me did I have an--any

4         understanding or any idea of what the

5         obligations were.  And so, for instance, I

6         know that Southern Health Partners provided

7         nurses for, you know, a number of hours

8         during the day and there were not nurses

9         overnight.  So I--I learned some of that

10        information from the case documents without

11        actually looking at the contract.

12   MR. HARNICE:      Madam Court Reporter, will you

13                     read back the question that I

14                     had asked about specific

15                     knowledge?  Dr. Fowlkes, I'd

16                     ask that you listen to this

17                     question and then answer it.

18                     It was, I think, one or two

19                     back.

20        (QUESTION IS PLAYED BACK VIA STENO AUDIO)

21   Q    Did you understand the question

22        Dr. Fowlkes?

23   MS. BRANNON:      Paul, I will tell you that I

24                     couldn't understand.  It--it

25                     was staticky.

49

1    MR. HARNICE:        Okay.  Let me--let me-

2

3    MS. BRANNON:        Sorry.

4    Q    Let me ask it again.  Dr. Fowlkes, do you

5         have any specific knowledge about the

6         contractual obligation that Southern Health

7         Partners had to Franklin County and the

8         Franklin County Regional Jail?

9    A    Yes.

10   Q    What specific knowledge do you have about

11        those contractual requirements?

12   A    That they specifically were going to

13        provide nurses for a number of hours but

14        not 24 hours per day.  They were going to

15        staff the jail with nurses for a certain

16        number of hours per day.

17   Q    So it's your testimony here today that the

18        contract between Southern Health Partners

19        and Franklin County and the Franklin County

20        Regional Jail that was in place in May of

21        2017 only provided that nurses would be

22        staffed at the Franklin County Regional

23        Jail?

24   A    That is not my testimony.

25   Q    Your testimony is is that nurses--it would

50

1        have at least provided--some nurses would

2        be staffed at the jail?

3   A    Yes.  That was a specific--you asked me

4        what specific knowledge did I have, and I

5        gave that as an example, specific knowledge

6        that I have.

7   Q    Do you know what the contractual provision

8        was relating to Southern Health Partners

9        having a medical director for the Franklin

10       County Regional Jail?

11  A    I do not.

12  Q    Do you know anything about--well, strike

13       that.  If you go down to Roman Numeral III

14       in scope of the report, it says, whether

15       SHP's Policies and Procedures regarding

16       health care at the FCRJ were reasonable and

17       appropriate.  Do you see that?

18  A    I do.

19  Q    And do you intend to offer an opinion that

20       those policies and procedures were

21       reasonable and appropriate?

22  A    Just a moment.  Let me ref--reference my

23       report, please.  Yes.  On page--it is

24       outlined on page 23 of my report.

25  Q    Do you intend to express an opinion as to

51

1       whether SHP's employees or independent

2       contractors followed all of the policies

3       and procedures?

4  A   Could you repeat the question, please?

5  Q   Do you intend to express an opinion at the

6       trial of this matter on whether SHP's

7       employees or independent contractors

8       followed all of the policies and

9       procedures?

10  A   I--I don't believe that I intend to offer

11       the opinion that they--especially not as it

12       relates to any independent contractors, but

13       the employees followed all of the--every

14       policy and procedure, no.

15  Q   As we sit here today, do you know whether

16       or not SHP's employees or independent

17       contractors followed all of the policies

18       and procedures?

19  A   You cut out at the end, but I believe

20       you--you ended the question with all of the

21       policies and procedures; is that correct?

22  Q   That's correct.

23  A   I am not aware of any instances in which

24       they did not, but I'm--I'm--again,

25       you're--you're using the all, and I am not

52

1        providing that opinion but I'm not aware of

2        any times when they did not follow the

3        policies and procedures.

4    Q   Would you agree with me that it's important

5        for SHP's employees and independent

6        contractors to follow the reasonable and

7        appropriate policies and procedures of SHP?

8    A   Well, policies and procedures are, of

9        course, guidelines, and there are certainly

10       exceptions to every rule.  So I don't--I

11       believe they--they provide--can provide

12       appropriate guidelines, but I don't believe

13       they necessarily can or should be followed

14       in every single instance.

15   Q   Well, would you agree with me that based

16       upon your education, training and

17       experience that the purpose for an entity

18       such as SHP to have policies and procedure

19       would be so that its employees and

20       independent contractors would follow them?

21   A   I--I believe it's the same answer I gave

22       before.  They have policies and procedures

23       to provide guidelines and framework within

24       to work.  In a specific instance, they may

25       or may not be appropriate to be followed

53

1        or--or be followed.

2   Q    Well, let me give you an example.  If--if

3        SHP had a policy and procedure that

4        man--mandated that an inmate would receive

5        a screening from an SHP employee or

6        independent contractor within 24 hours of

7        admission to the jail, would you agree with

8        me that it would be important that that

9        would take place within a 24 hour period

10       absent an extenuating circumstance?

11  A    Because of some--could the court reporter

12       try to read that back?  There was some

13       fuzziness.  I wanted to make sure I

14       understood the middle portion of that

15       question.

16  Q    I will try to state it again because I

17       think reading it back is not going to get

18       us anywhere.

19  A    Okay.

20  Q    So my question to you is:  If Southern

21       Health Partners had a policy and procedure

22       which provided that an SHP employee or

23       independent contractor would complete a

24       screening of an inmate within 24 hours of

25       the inmate being admitted [inaudible],

54

```
 1        would you agree that it's important that

 2        SHP should follow--should comply with that

 3        24 hour policy absent there being

 4        extenuating circumstances?

 5   A    I would agree that that is a reasonable

 6        policy.  I would agree that the medical

 7        provider should endeavor to follow that

 8        policy and procedure and--and do as they

 9        did in this case and provide a screening

10        within that period of time.  So it's not an

11        issue in this case, but in general that is

12        a--a reasonable guideline; yes.

13   Q    So it's your belief that SHP performed a

14        screening within 24 hours of Ms. Love being

15        admitted to the jail?

16   A    It is my--it is my belief and my

17        interpretation that she was seen by a nurse

18        the next morning.  So some--some hours

19        after she came in she was evaluated by that

20        nurse.  She was in a restraint chair at

21        that time, and during the--and--and care

22        was provided that day.  The screening

23        per--exam itself was performed on Monday

24        morning.  So slightly more than 24 hours

25        but certainly reasonable given that she was
```

55

1        in a--a restraint chair.

2    Q   I don't--I'm going to have to--I'm going to

3        have to ask you to explain some of that

4        answer.  I apologize.  My question is best

5        asked this way:  From the time that

6        Ms. Love was admitted to the jail, do you

7        know how long it took before SHP completed

8        the medical screening form?

9    A   You said--did--you're--you're--you--you cut

10       out--you cut out some.  But you said

11       completed the medical screening form; is

12       that correct?

13   Q   Well, I'm sorry.  Yes.  Do you know how

14       many hours?

15   A   Well, I--I--if you're--hold on just a

16       moment.  I'm trying to find the exact time

17       that she was brought in.  I believe it was

18       prior to 4 a.m.  I know it was 4 a.m. when

19       the booking officer completed the receiving

20       screening form but it was some period of

21       time before that that she had actually been

22       brought in.  It was then about something on

23       the order of 7:01, so three hours later

24       when she was seen by the nurse.  So she was

25       seen and evaluated by the nurse,

56

1 approximately, three hours later and seen

2 several times during the course of that

3 day.  She was, of course, in a restraint

4 chair during a good portion of that time.

5 So a--an evaluation of her occurred,

6 approximately, three hours after the

7 booking officer had completed his receiving

8 screening.

9 Q And so is that what your--your testimony is

10 that if Ms. Love was brought in at--or was

11 booked at the Franklin County Regional Jail

12 at 4:17 a.m., which I believe paragraph 4

13 on page 5 of your report said, that it's

14 your testimony that the screening by

15 Southern Health Partners took place a

16 little under three hours after that and

17 that that complied with the 24 hour policy

18 and procedure?

19 A Well, no.  There were extenuating

20 circumstances in this case because the

21 correctional officers had placed Ms. Love

22 in a restraint chair by that time.  So she

23 was restrained that morning, so that would

24 be extenuating circumstances.

25 Q Do you know how long Ms. Love was in the

57

1          restraint chair?

2    A    Not for a prolonged period of time.  She

3          was released sometime that morning.  I

4          don't--let me--I believe we might have that

5          time.  Hold on.  I don't have the exact

6          time, but I believe it was sometime

7          certainly on the day of the 14th.

8    Q    And is it your belief that SHP performed

9          its screening, medical screening form that

10         morning, later that morning of the 14th?

11   A    You said its screening form.  No, it's

12         clear when the screening form was filled

13         out was on Monday morning.

14   Q    At 11:11 a.m.?

15   A    Hold on a moment.  I will tell you.  That

16         is correct.

17   Q    So would you agree with me that that is

18         from 4--sorry, from 4 [inaudible] p.m. on

19         Sunday, May 14th until 11:11 a.m. on

20         Monday, 5--May 15th is greater than 24

21         hours?

22   A    I would agree with that statement that it

23         is 27 hours; yes.

24   Q    Well, actually, it's much greater than 27

25         hours; isn't it, sir?

58

```
 1   A    Oh, I'm sorry.  Yeah.  I was thinking 7:00.
 2        Yeah.  Well, 30 hours.
 3   Q    Would you agree with me based upon your
 4        education, training and experience
 5        [inaudible] a medical staff at a jail is
 6        presented with an inmate that had the
 7        conditions of Ms. Love, that getting
 8        [inaudible] Ms. Love as quickly as possible
 9        is very important?
10   A    I'm very sorry, but the middle portion of
11        that cut out.
12   Q    Would you agree with me that when
13        staff--when medical staff at a jail are
14        presented with an inmate that has
15        conditions such as Ms. Love presented with
16        on the morning of May 14th that it is vital
17        that medical staff get as much information
18        about Ms. Love as quickly as possible?
19   A    No.  No.  If you had added, as much
20        information as possible as quickly as
21        possible, I would have agreed with you, but
22        as written, no.  I mean, as said.
23   Q    Well, let--let--let's--Doctor, for the
24        ladies and gentlemen of the jury, when a
25        situation--when a medical staff is
```

59

```
 1            presented with a situation like Ms. Love,

 2            isn't it accurate that it's important for

 3            medical staff to get as much historical

 4            information about Ms. Love as possible?

 5    A       As--as possible, that is correct.  Which is

 6            very difficult with a psychotic person who

 7            is in a restraint chair and who had denied

 8            she was pregnant.  Yes, it--so there's

 9            going to be a limited amount of information

10            that was available.  But, yes, they should

11            get as much as they--

12    Q       Well, wouldn't you agree with me that that

13            makes it all the more important that when

14            SHP learns of Ms. Love's OBGYN that they

15            contact the OBGYN as quickly as possible?

16    A       Absolutely.  Which I believe they did in

17            this case.

18    Q       Okay.  Do you know why the SHP nurse did

19            not perform the 24 hour screening as soon

20            as she arrived on the morning of May 15th?

21    A       I do not.

22    Q       Would you expect a reasonably prudent nurse

23            to have performed that screen as soon as

24            she came in on the morning of Monday,

25            May 15th even though that was just a few
```

60

1        hours beyond the 24 hour period?

2   A   I would not.

3   Q   You would not have expected that?

4   A   I mean--

5   Q   And why--why wouldn't you have expected

6        that nurse to perform that function as soon

7        as she came in the following day?

8   A   Well, because she had seen her the day

9        before.  She came in on a Monday morning,

10       she would take care of what was most urgent

11       medically.  Ms. Love was not having any

12       symptoms or any problems that required

13       immediate addressing.  And she addressed it

14       that morning at 11 a.m., which I believe is

15       perfect--perfectly reasonable.

16   Q   Even though it's well beyond the 24 hour

17       guideline?

18   A   That's your phrasing of--of it.

19   Q   Well, it's well beyond the 24 hour policy

20       and procedure?

21   A   I don't agree it's well be--I do not agree

22       that it is well beyond.  It's slightly--

23   Q   Yes, it is.  Why--why--do you know why

24       Ms. Sherrow didn't perform the screening

25       before she left work on Sunday, May 14th?

61

1   A    I do not.

2   Q    Would you agree with me that if she saw

3        Ms. Love in the restraint chair at 7 a.m.

4        on Sunday, May 14th and she didn't leave

5        the Franklin County Regional Jail until

6        several hours later that it would have been

7        best for her to have done the screening

8        that day?

9   A    No, I would not.

10  Q    Why don't you think that--why do you not

11       believe that doing the screening sooner

12       rather than later is a good thing?

13  A    She already had done the screening.  She

14       knew that she was pregnant, she knew that

15       she was not having symptoms referable to

16       the pregnancy, she was having a

17       presentation of a lady to substance abuse.

18       She had the information that she needed.

19       They were--they were working with the

20       mental health professional.  There wasn't

21       any further information that was needed.

22  Q    Well, is it your contention that the screen

23       occurred at 7:01 a.m. on May 14th?

24  A    It is my contention that the nurse saw

25       Ms. Love shortly after she came to work at

62

```
 1          7:01 a.m.  By the way, I--I would like to

 2          request a--a restroom break at--at your

 3          convenience whenever you get--

 4   MR. HARNICE:        Oh, yeah.  Anytime.

 5                       Let's--let's go off the

 6                       record, and we'll come back in

 7                       five minutes.  Is that

 8                       sufficient?

 9   THE WITNESS:        It is.  Thank you.

10   VIDEO TECHNICIAN:  The time is 2:39.  We'll go

11                       off the video record.

12          (OFF THE RECORD)

13          (A BRIEF BREAK IS TAKEN)

14   VIDEO TECHNICIAN:  We are back on the video

15                       record at 2:45.

16   By Mr. Harnice:

17   Q    Mr. Fowlkes, I--I believe-or, Dr. Fowlkes,

18          I apologize--that we were talking about

19          whether it was your opinion that Nurse

20          Sherrow's encounter with the plaintiff at

21          7:01 a.m. on Sunday, May 14th constituted

22          the medical staff receiving screening.  And

23          I'm not sure I--I ever got an answer on

24          that, I think where--where we left it off.

25          So I'll ask that question.  Is it your
```

63

1      position that when Nurse Sherrow examined

2      the plaintiff at 7:01 a.m. on Sunday,

3      May 14th that constituted the medical staff

4      receiving screening?

5  A   Well, she certainly saw her and evaluated

6      her.  She, more likely than not, was not

7      able to get all the information.  Ms. Love

8      was in a psychotic state essentially.  She

9      had been uncooperative.  She had to have a

10     use of force by the security staff.  She

11     had been placed by the security staff into

12     a restraint chair.  So it would not be

13     reasonable to do an entire medical

14     screening at that time, but she got

15     pertinent information and she evaluated

16     her, and then the next morning the

17     remainder of that medical screening was

18     accomplished.

19 Q   And my question to you is:  Would it have

20     been a good thing if Ms. Sherrow would

21     have--would have gone ahead and done the

22     medical staff receiving screening later on

23     the day on May 14th before she left work?

24 A   No.  She quite likely wouldn't have been

25     able to get all of the information with

64

1          Ms. Love in the condition that she was.  So

2          she got the necessary information, and it

3          was appropriate for her to do the

4          screening, complete the rest of the

5          information the next day.

6     Q    And so what makes you--or what facts do you

7          base your opinion that she most likely

8          couldn't have gotten the information she

9          needed later on May 14th?

10    A    Because Ms. Love is described as--as being

11         psychotic and uncooperative and not

12         answering questions on the day of the 14th.

13    Q    Have you read Ms. Sherrow's deposition

14         testimony?

15    A    One moment, please.  I have not.

16    Q    Do you have any reason to believe

17         Ms. Sherrow's not a truthful person?

18    A    I have no base--no basis to believe she is

19         not.

20    Q    Do you have any reason to believe

21         Ms. Sherrow did anything other than tell

22         the truth during her deposition?

23    A    I have no basis to believe she did not.

24    Q    Are you--is it your intention to give an

25         opinion at the trial of this matter that,

65

1        based upon your education, training and

2        experience as a medical doctor, that

3        Ms. Love was having a psychotic

4        epi--episode on the morning of May 14th?

5    A   Well, she was clearly having an episode and

6        she was clearly had--had psychotic behavior

7        during that.  Whether it was strictly a

8        psychotic episode or whether it was a--a

9        drug induced uncooperativeness, et cetera,

10       I--I don't know if it meets the

11       strict--strict criteria of a psychotic

12       episode.  But, yes, she was clearly having

13       a--a mental health problem that had

14       required the use of chemical restraint and

15       the use of physical restraint and had

16       required consultation with the mental

17       health professionals and she had been

18       placed in a restraint chair by the security

19       staff.  So she was clearly having a mental

20       health problem.

21   Q   And if that mental health problem rose to

22       the level of where--where Ms. Love needed

23       to be sent to the hospital, then the SHP

24       nurse could have sent her to the hospital

25       at 7:01 a.m. on the morning of May 14th;

66

```
 1          correct?
 2    A     That is possible, as it's possible that the
 3          security staff could have sent her there
 4          before that, or the arresting officer could
 5          have taken her there as he did when he
 6          arrested her.  Any of those things are
 7          possible; yes.
 8    Q     Who is--based upon your education, training
 9          and experience as a medical doctor, between
10          a layperson jail employee, a police
11          officer, and a registered nurse, of those
12          three which one is best capable of
13          determining the physical condition of an
14          inmate?
15    A     As it relates to what?
16    Q     As it relates to whether or not that inmate
17          needs medical care.
18    A     So, for instance, if you're asking about
19          under the influence of--of substances, I
20          would say that, as in this case, the
21          arresting officer would be in a good
22          position to know whether they needed
23          emergency medical care.  And so he took her
24          to the hospital, she apparently refused
25          treatment or refused the drug test at that
```

67

1      time.  So he did not feel that she needed

2      to be involuntarily treated at the

3      hospital.  He brought her to the jail where

4      correctional officers performed a--a

5      reasonable receiving assessment.  They did

6      not find that she needed to go to the

7      hospital for her substance use behavior.

8      And then that morning she became

9      uncooperative, they--they felt she was

10     suicidal.  They put her in a restraint

11     chair, which was reasonable, and called the

12     mental health professionals who recommended

13     that.  And--and--

14  Q   Well, what's the--

15  A   --so all of those things are reasonable.

16  Q   Well, what's the answer to my question?  My

17     question is:  Of the three, a

18     layperson/jail staff, a police officer, or

19     a registered licensed nurse within the

20     Commonwealth of Kentucky, which of those is

21     best able to determine whether or not an

22     inmate is in need of medical treatment?

23  A   Well, I--I asked the question what

24     specifically you're talking about.  If

25     you're talking about drug use, I would say

68

1       that all three of them are equally able to

2       determine that.  If you're talking about,

3       more specific--if you have a hypothetical

4       about specific medical conditions, the

5       nurse may be more able to do that.  But

6       we're talking about essentially a layperson

7       deciding whether a person needs to be taken

8       to the hospital due to their substance use

9       or not.  And in this case a trained law

10      enforcement officer on the street, a

11      trained correctional officer, and a trained

12      nurse would all be in about the same

13      position.

14   Q  Do you know why the police officer took

15      Ms. Love to the hospital before he took her

16      to the jail?

17   A  He--yes, he was attempting to get a--drug

18      testing on her to determine what substances

19      she was under the influence of and how--and

20      how much.

21   Q  And was--do you know if that was as a

22      result of a potential driving under the

23      influence charge?

24   A  Well, she was driving under the influence

25      as well as acting bizarrely at the scene.

69

```
 1          So it was probably a combination.  But,
 2          yes.
 3    Q     And what--how do you know she was driving
 4          under the influence at the--at the time she
 5          was stopped?
 6    A     I--I don't.  I know that that was what he
 7          was charging her with.
 8    Q     Do you know whether or not the police
 9          officer and Ms. Love ever went into the
10          jail--I mean--I apologize.  Strike that.
11          Do you know whether or not Ms. Love and the
12          police officer ever entered the hospital
13          prior to going to the jail?
14    A     I do not.
15    Q     Back on [inaudible] May 14th, 2017--
16    MS. BRANNON:      Paul, you just broke up.
17    Q     Back to May 14th, 2017 at 7:01 a.m.  You
18          would agree with me that Nurse Sherrow
19          examined Ms. Love [inaudible] restraint
20          chair; correct?
21    A     You--you--you broke up some, but you said I
22          would agree that Ms.--that Nurse Sherrow
23          examined Ms. Love in the restraint chair,
24          and I would--I would agree with that.
25    Q     And if you go to page 7 of your report,
```

70

1      paragraph 8, the last sentence, it states

2      that, a restraint chair observation log was

3      started at 5:25 a.m. and was stopped at

4      7:02 a.m. on the morning of May 14th, 2017.

5      Is that correct?

6   A   That--that is correct.

7   Q   So it appears one minute after Ms. Sherrow

8      examined Ms. Love at 7:01 a.m. that the log

9      was discontinued; correct?

10  A   I'll agree.

11  Q   Let me have you turn to page 9 of your

12     report.  And at the very top of page 9--I'm

13     sorry.  Why don't you--let--let's go to

14     page 8, paragraph 12.  There's a gap in

15     the--there's a gap in the page.  But you

16     see--you see that on Monday, May 15, the

17     SHP nursing staff, a, completed this

18     medical staff receiving form.  And then

19     let's go over to page 9.  Is that what you

20     understand to be the screening form?

21  A   That's correct.

22  Q   And up in the top righthand corner, it

23     appears that this was done on May 15th,

24     2017 at 11:11 a.m.; correct?

25  A   That is correct.

71

1    Q    And you've agreed with me that that was,

2         approximately, 7 hours after Ms. Love--I'm

3         sorry, it was, approximately, 31 hours

4         after Ms. Love was admitted to the jail;

5         correct?

6    A    I--I agree.

7    Q    Do you know if SHP had a policy or

8         procedure which required Ms. Love to be

9         referred to an SHP employee or independent

10        contractor as a result of the answers given

11        to this medical staff receiving screening

12        form?

13   A    I do not know the answer to that.

14   Q    If Ms. Sherrow testified that she failed to

15        follow SHP's policy and procedure, would

16        you have any reason to doubt Ms. Sherrow's

17        testimony?

18   MS. BRANNON:      Object to the form.  You may

19                     answer.

20   A    I--I wouldn't know.  Without looking at

21        specifically what her testimony was and

22        without looking at the spe--specific policy

23        and procedure, I would not have a way of

24        knowing whether Ms. Sherrow was correct or

25        not.

72

1    Q    So if Ms. Sherrow said she vio--she

2         vio--failed to follow a policy and

3         procedure of SHP, you would want to take a

4         further look at her opinion as to whether

5         or not she violated said policy and

6         procedure?

7    A    As well as the policy and procedure; yes.

8    Q    You just wouldn't take Ms. Sherrow's word

9         about her own actions?

10   A    That's correct.

11   Q    Do you know of any reason on Monday,

12        May 15th as to why Ms. Sherrow did not

13        perform the medical staff

14        receive--receiving screening form prior to

15        11:11 a.m.?

16   A    I believe I've already answered that, that

17        I do not know a reason.

18   Q    Would you agree with me that, based upon

19        your education, training and experience as

20        a medical doctor in an incarceration

21        setting, that any of the information

22        contained on this screening form--form from

23        the inmate sooner rather than later is a

24        good thing?

25   A    That is, in general, a reasonable

73

1      statement.  I--I don't know that it would

2      make any difference 7 a.m. to

3      11--11:11 a.m. in this particular case,

4      especially because Ms. Love is not having

5      any symptoms referable to her pregnancy.

6      So I don't know what difference it would

7      make in this particular case.  We also

8      don't know--you know, we know that Nurse

9      Sherrow evaluated her the day before, so it

10     is quite possible that most or all of the

11     information had already been obtained that

12     day before.

13   Q   And on what do you base that assertion?  Do

14     you have any facts to base that assertion

15     on?

16   A   I--I know that she evaluated her, and I

17     know that she was in a restraint chair, and

18     I know that she didn't have any problems

19     overnight, and she wasn't having any

20     medical problems on the morning of the

21     15th.

22   Q   On the morning of May the 14th at 7:01, do

23     you know what the purpose of Ms. Sherrow's

24     examination of Ms. Love was?

25   A   Well, I can make an educated guess.  She

74

1      had--there was a person who was brought in

2      the night before intoxicated, acting very

3      bizarrely who had been sprayed with pepper

4      spray and was now restrained in a restraint

5      chair. So I would imagine she was

6      evaluating her to see about those things.

7   Q  Well--and you haven't seen Ms. Sherrow's

8      testimony on that issue; correct?

9   A  I've seen Ms. Sherrow's documentation in

10     the case record.

11  Q  And are--do you know whether or not

12     the--well, strike that. Strike that.

13     Well, you said it really wouldn't make

14     any--so what--is your testimony to the

15     ladies and gentlemen of the jury that on

16     May 15th of 2017 there was really no

17     difference if Ms. Sherrow would have

18     performed the medical staff receiving

19     screening form at 8 a.m. versus 11:11 a.m.?

20  A  That is correct.

21  Q  And you see no benefit of her having done

22     that earlier?

23  A  In this particular case, that is correct.

24  Q  Well, when Ms. Sherrow arrived at work on

25     the morning of Monday, May 15th, 2017,

75

1        based upon your review of the documents in

2        this case, what do you think Ms. Sherrow

3        knew about Ms. Love?

4    MS. BRANNON:       Object to the form.

5    A    Well, you'd have to ask Ms. Sherrow about

6        what she knew on that day, but what I--what

7        I know from the record is that she had seen

8        her the day before, Ms. Love had denied

9        being pregnant to the--to the arresting

10       officer.  Then there had been a notation

11       that she was pregnant to the correctional

12       officers.  I believe that the record--that

13       the evaluation on the--early on the morning

14       of the 14th Ms. Love had denied that she

15       was pregnant again.  So in other words, I

16       know there was discussion about she either

17       was or wasn't pregnant, and I believe that

18       the--that Ms.--that Nurse Sherrow certainly

19       felt that she was likely pregnant.  She was

20       also having clear mental health problems

21       and/or substance abuse problems which had

22       required triage to the jail mental health

23       triage people, had required suicide watch,

24       had required restraint chair the day before

25       but that had been discontinued.  So I know

76

```
 1        that she knew all of those things, but

 2        exactly what else was in her mind I'm not

 3        certain of.

 4   Q    Do you have--based upon the documents

 5        you--you reviewed, were you able to surmise

 6        what Ms. Love didn't--I'm sorry.  Based

 7        upon the documents you reviewed, were you

 8        able to surmise what Ms. Sherrow didn't

 9        know about Ms. Love on the morning of

10        May 15th?

11   MS. BRANNON:      Object to the form.

12   A    Well, I don't know that I can answer.  I

13        mean, I'm sure there was a lot about her

14        past history she didn't know.  What--so

15        I'm--I'm quite sure there was much about

16        her past history, her past drug use, her

17        past pregnancies that she had not revealed

18        and that Nurse Sherrow did not know.  But I

19        also--but specifically one other thing that

20        I believe she didn't know and I don't--and

21        I believe she didn't know it because I

22        don't believe it existed is that Ms. Love

23        wasn't having any pregnancy complications

24        or--or signs of labor.

25   Q    So would it be your testimony, Dr. Fowlkes,
```

77

1    that if--rather than this exam being

2    performed at 11:11 a.m., if it would have

3    been performed at 3 p.m. on Monday,

4    May 15th that that would have been okay, as

5    well?

6  A   Well, Nurse Sherrow took some additional

7    actions which I believe were reasonable.

8    So, for instance, requesting her prior OB

9    records, ordering a prenatal vitamin,

10   ordering a pregnancy diet, calling a local

11   OB doctor and setting her an appointment

12   in--in two days on Wednesday.  So had you

13   waited later in the day, those things might

14   not have been accomplished for that day.

15   So obviously those things were reasonable

16   and were, I believe, done in a timely

17   fashion.  What would be the latest that

18   those could be performed and still get

19   accomplished within that day, I--I don't

20   know the answer to that.

21  Q   Would you agree with me that it would have

22   been a good thing had Nurse Sherrow called

23   Dr. Baldwin's office to ask questions on

24   Monday, May 15th?

25  A   Dr. Baldwin is the--is the OBGYN from

78

1     Indiana that had seen her previously; is

2     that--that is correct?  I just want to make

3     sure I'm correct on the name.

4  Q   That's correct.

5  A   Okay.  I don't believe it would have made

6     any difference.

7  Q   So if--you don't believe it would have made

8     any difference if Nurse Sherrow called up

9     Dr. Baldwin's office to get Ms. Love's

10     history of prior childbirth and other

11     treatments received by Dr. Baldwin?

12  A   That's correct.

13  Q   Well, let me ask you this:  If, for

14     instance--if--wouldn't it have been

15     beneficial to Nurse Sherrow to know if

16     Dr. Baldwin's records reflected that Ms.

17     Love previously had a premature birth?

18  A   No, I don't believe it would have been

19     helpful.

20  Q   So why--why get Dr. Baldwin's records at

21     all?

22  A   So that they could determine--it wasn't

23     just about what was going--they were able

24     to determine whether she was having

25     problems related to this pregnancy, so

79

1       pre-term labor, et cetera.  It would be

2       more to look at how extensive her drug use

3       had been during this pregnancy, what amount

4       of prenatal care she had had, what--there

5       are certain tests, RH factor, et cetera

6       which are important to know prior to

7       delivery, so the--the extent that she had

8       had prenatal labs.  All these things

9       were--would be important.  They weren't

10      going to take her back to--to Dr. Baldwin

11      but the more that they knew about her past

12      drug use and her--her prenatal care during

13      this pregnancy the better it would help the

14      OB doctor that she was going to see on

15      Wednesday.

16  Q   So is--is it your testimony that if the

17      records were requested on May 15th and they

18      came in a week later, that's fine, or would

19      there be no need to talk to Dr. Baldwin

20      during that period?

21  A   No, that's not my testimony.

22  Q   Well, you would agree with me that Nurse

23      Sherrow had the authority to pick up the

24      phone and call Dr. Baldwin's office to ask

25      about the contents of Ms. Love's file;

80

1           correct?

2    MS. BRANNON:        Object to the form.

3    A    Well, I don't know that it requires

4         authority for anyone, a nurse, layperson to

5         pick up the phone and call a doctor's

6         office and ask about somebody's else

7         medical condition, but I believe that it is

8         unreasonable to expect that that doctor

9         would pick up the phone and talk to you

10        about somebody else's medical condition in

11        the absence of a release of information.

12   Q    Well, and didn't--is it your understanding

13        that what--after the 11:11 a.m. meeting

14        that Nurse Sherrow faxed to Dr. Baldwin's

15        office the author--authorization for

16        release of medical information to

17        correctional facility?

18   A    That is my understanding.  And--and so

19        that--and hence my point, when

20        Dr. Baldwin's office received it, did they

21        have information that they believed was

22        urgent to get to the people who were now

23        caring for Ms. Love, they could have and,

24        more likely than not, would have picked up

25        the phone and said, hey, we've been looking

81

1          for this person.  She--she needs X, Y, Z,

2          she's--we think she's going to deliver

3          today.  So to the extent they had

4          information that would change things, they

5          would more likely than not not just copied

6          the records and put them in the mail,

7          regular postal mail.  They would have

8          called and told them the information that

9          was important if they thought it was

10         important.

11    Q    So based upon your training--education,

12         training and experience as a medical

13         doctor, you believe that it should have

14         been Dr. Baldwin's office calling Nurse

15         Sherrow if there was an emergency situation

16         versus Nurse Sherrow calling Dr. Baldwin's

17         office?

18    A    Well, that is not--that is not entirely my

19         opinion.  What I believe is that in this

20         case it was routine information and it was

21         reasonable of Dr. Baldwin's office to have

22         copied them and put them in the mail.  But,

23         yes, I do believe that if a doctor was

24         aware of emergency information on a patient

25         they had been trying to track down or

82

```
 1              something that it would incumbent on them

 2              to call the person and say, hey, we've been

 3              looking for this person and they need X, Y,

 4              Z.  I don't believe that existed here,

 5              though.

 6     Q   Based upon your education, training and

 7              experience as a medical doctor in a

 8              correction facility environment, do you

 9              know whether or not Nurse Sherrow

10              was--could have received the information

11              via from Dr. Baldwin's office without

12              Ms. Love signing the authorization for

13              release of medical information to a

14              correctional facility?

15     A   I--I do know the answer to that.  And--

16     Q   What is the answer?

17     A   It is--so forgetting about correctional

18              facilities, it is--treating physicians, you

19              can have an exception to HIPAA and you are

20              allowed to get information that is

21              necessary for ongoing care.  The problem is

22              that almost no--no facility, no hospital,

23              no--no doctor's office will give it to you.

24              So it technically is possible, but as a

25              practical matter without a release of
```

83

1          information you're probably not going to

2          get someone to talk to you.

3    Q    Are you familiar with file a privacy rule,

4          page 82540 from HIPAA?

5    A    I might well be, not by the numbers.  If

6          you'd like to show it to me--it's probably

7          what I just--just suggested; or then

8          there's another--I don't know if they're

9          referring to that or the law enforcement,

10         although the law enforcement exception does

11         not apply here.

12   Q    So it would just--it's speculation on your

13         part, though, as to whether or not

14         Dr. Baldwin's office would have spoken to

15         Nurse Sherrow; correct?

16   A    No, it's not speculation.  It's based on my

17         training, education and experience that,

18         more likely than not, a doctor's office

19         will not provide you information without

20         that.

21   Q    Do you know any of the past history of

22         Dr. Baldwin's office as to whether or not

23         they'd spoken to nurses [inaudible] about

24         patients?

25   A    I do not.

84

| | | |
|---|---|---|
| 1 | Q | Do you know--do you know Dr. Baldwin? |
| 2 | A | I do not. |
| 3 | Q | Do you know anybody in Dr. Baldwin's |
| 4 | | office? |
| 5 | A | I do not. |
| 6 | Q | Do you know anything about Dr. Baldwin's |
| 7 | | practice? |
| 8 | A | Well, yes. |
| 9 | Q | What do you know about Dr. Baldwin's |
| 10 | | practice? |
| 11 | A | He is an OBGYN who's located in Indiana who |
| 12 | | had seen Ms. Love, I believe two times |
| 13 | | during this pregnancy. I believe he is the |
| 14 | | OBGYN who had delivered, at least, some of |
| 15 | | her prior deliveries. He was aware of her |
| 16 | | drug use, and he had been not present at |
| 17 | | the hospital but at his office when she |
| 18 | | reported to a labor and delivery some |
| 19 | | period of time before and had walked out. |
| 20 | | So I--I know those things about his |
| 21 | | practice, but that's about the extent of |
| 22 | | it. |
| 23 | Q | Yet you--you think you're cap--you're |
| 24 | | capable of telling the ladies and gentlemen |
| 25 | | of the jury, you're capable of expressing |

85

1        your opinion that it's more likely than not

2        that Dr. Baldwin's office would not have

3        spoken to Nurse Sherrow?

4    A   I--I didn't say that specifically about

5        Dr. Baldwin.  I said that in general it is

6        more likely than not that doctors' offices

7        to whom you call would not speak with you

8        without a release of information.  That was

9        my testimony.

10   Q   And so my--my question to you is:  You

11       would be purely speculating as to whether

12       or not Dr. Baldwin's office would have

13       spoken to Nurse Sherrow at 8 a.m. on

14       Monday, May 15th; correct?

15   A   I--that is your characterization of it as

16       purely speculating.  I--I believe I--I've

17       already answered my question--your question

18       and I don't know that I can express it any

19       more clearly.

20   Q   And your--your--your answer is you just

21       think it's more likely than not that

22       Dr. Baldwin wouldn't have done it?

23   A   I said as it relates to doctors' offices in

24       general.  Dr. Baldwin may or may not have.

25       More likely than not, doctors' offices will

86

1    not.  I cannot speak to specifically what

2    Dr. Baldwin would have done in this

3    instance.

4  Q    It's possible that if Nurse Sherrow would

5    have called him at 8 a.m. that either

6    Dr. Baldwin or somebody in his office could

7    have--could have spoken to her about an

8    ho--for an hour about Ms. Love; correct?

9    That's possible?

10  A    It is entirely--

11  MS. BRANNON:      Object to the form.

12  A    It is entirely possible.

13  Q    Let me get you to refer to the bottom of

14    page 9 of your report.  And at--the very

15    last sentence at the bottom of page 9

16    starts, WCBG called the SHP nurse back and

17    scheduled Ms. Love for an appointment with

18    an OB physician and an ultrasound on

19    Tuesday, May 17th at 11:30 a.m.  Did I read

20    that correctly?

21  A    You read it correctly, but my copy--my copy

22    has a handwritten cross out that says

23    Wednesday.  So that was actually Wednesday,

24    not Tuesday, 5/17.

25  Q    That's what I was going to ask you.  So

87

1    you're going to correct that error in your

2    report?

3  A    I--I already have on my copy that I have in

4    front of me.  I'm sorry yours doesn't

5    reflect that.

6  Q    Do you have other notes on the copy in

7    front of you that you're testifying to?

8  A    I do not.

9  Q    Is that the only handwritten comment on it?

10  A    If you--

11  Q    Because I haven't seen that.

12  A    I understand that.  And, yes, it is my

13    belief--and I--I don't want to misstate, so

14    I'm going to flip through the pages and

15    make sure there's no other handwritten--I

16    believe that's the only one.  That is the

17    only handwritten note on that.  And the

18    only other handwritten note on any of the

19    documents I have is really only a

20    housekeeping matter that the--if you want

21    me to tell it to you, I will, but--

22  Q    Yes, please.

23  A    Okay.  The Frankfort Regional Medical

24    Center records, and I have this handwritten

25    note, plaintiff--this was part of

88

1       plaintiff's request for production of

2       documents.  And I started printing them

3       out, the--the relevant pages before I--they

4       were Bates stamped.  And so the first few

5       were not Bates stamped and I had to go back

6       and handwrite the Bates stamp number at the

7       bottom rather than re-print them.

8    Q  Any other changes?

9    A  No.

10   Q  Okay.  Let's go to page 11, paragraph 13.

11      It says, SHP nursing staff was on duty at

12      Franklin County Regional Jail until

13      approximately 6:45 p.m. on Monday evening,

14      May 15th, 2017.  There were no problems

15      reported to the nursing staff after the

16      3:15 p.m. assessment.  Franklin County

17      Regional Jail does not have SHP nursing

18      staff present in the facility overnight.

19      Did I read that correctly?

20   A  You did.

21   Q  Now, as of 3:15 p.m. on May 15th, SHP had

22      not received Dr. Baldwin's records; is that

23      correct?

24   A  That's correct.

25   Q  They had not reached out to speak to them

89

1      via telephone other than to send them

2      the--the medical record request; is that

3      correct?

4   A   The--to the best of my understanding,

5      they--they faxed the records only.  I--if

6      they did or didn't attempt to call them, I

7      don't have information one way or the

8      other.

9   Q   But--but your opinion is that this really

10     wasn't important on the late afternoon of

11     May 15th of 2017; correct?

12  A   That's correct.  I mean, it's--it's

13     important that they reached out to them and

14     that they got the records.  It would be

15     important that they would, hopefully, have

16     them by the time she went to the OBGYN on

17     Wednesday.  But it was not important on

18     that afternoon and it wouldn't have changed

19     anything they were going to do that

20     day--that day.

21  Q   Is it--would it have been better for SHP to

22     get the records on Monday, May 15th or

23     Wednesday, May 17th?

24  A   You're asking me to choose one of those

25     two; is that what you're saying?

90

1  Q    Yes.  Yes.

2  A    It was important that they have it by the

3       time she went to the doctor on Wednesday.

4  Q    Based upon your education, training and

5       experience as a medical doctor, would you

6       agree with me that it's better to get

7       medical records regarding an inmate sooner

8       rather than later?

9  A    If it makes--if it's going to make a

10      difference in their care or their outcome,

11      yes, I would agree.  Otherwise, it would

12      not matter one way or the other.

13 Q    How does a medical professional know that

14      it's going to make a difference in the care

15      of the outcome until they get the records

16      and look at them?

17 A    Well, it's in the outcome of the case.  So

18      in other words, what happens in the case.

19 Q    In hindsight?  You're saying in hindsight?

20 A    Well--so, for instance, in this case,

21      if--if there was--if they were concerned

22      about should they send her to the hospital

23      that day, then they should have tried to

24      find additional information if they're--and

25      if it would have made a difference in their

91

1       care and what they were going to do.  So

2       about the time--if it was important for

3       Nurse Sherrow to have information to make a

4       decision such as am I going to send this

5       person to the hospital or am I not, then,

6       yes, it could be important.  In this

7       particular case, it's background

8       information about how much prenatal care

9       she's had, what her drug use is, what her

10      prior obstetrical history is, and that's

11      information that's more important to the OB

12      doctor she's going to see on Wednesday than

13      to a nurse or a correctional officer about

14      what management decisions they're going to

15      make in the meanwhile.

16  Q   On the afternoon of Monday, May 15th, do

17      you know what SHP understood to be

18      Ms. Love's due date?

19  A   Yes, I do, in that I know that she told

20      someone there what her due date was.  I

21      don't recall it off the top of my head.  I

22      could probably look back and find it.  And

23      I also don't know if that was exactly

24      accurate because I know she gave a bunch

25      of--or--or I'm sorry.  She gave several

92

1          different versions of whether she was

2          pregnant, whether she wasn't, how far along

3          she was.  So there were several different

4          answers she gave, but, yes, I believe she

5          did tell them a due date.  And it was

6          sometime in June, but I don't recall the

7          specific date.

8     Q    Would you agree with me that on the

9          afternoon of Monday, May 15th it would have

10         been a good thing if SHP had received

11         Ms. Love's due date as determined by

12         Dr. Baldwin?

13    A    I don't know that it would have changed

14         their management on that day; no.

15    Q    So not having a specific due date is not

16         that big a deal as determined by a doctor?

17    A    If one is not having labor, no, it is--I

18         mean, obviously in general you need to know

19         whether she's late in pregnancy, early in

20         pregnancy, et cetera.  But the specific due

21         date in the absence of labor type symptoms

22         or other concerning symptoms for pre-term

23         labor, no, it's not important.

24    Q    Well, what if--what if the actual due date

25         was, let's say, 20 days out, but the inmate

93

```
1              told you it was 28 days out?  Would that

2              make a difference to you?

3    A    No.

4    Q    What if the inmate told you it was 35 days

5              out?  Would that make a difference to you?

6    A    So first of all, I--I guess you're aware of

7              this, but there's several different ways

8              due dates can be calculated.  From last

9              menstrual period, from ultrasound dating.

10             And the earlier those are done the better

11             they are.  So the most accurate would be a

12             fairly early ultrasound with--often

13             people's knowledge of what their due date

14             is is based only on their last menstrual

15             period.  And in this particular case--I

16             can't remember what Dr. Baldwin's

17             information was based on.  I think it was

18             based on an ultrasound.  But my point is

19             that, no, it wouldn't matter as long as,

20             you know, it's within the ballpark of--you

21             know, of weeks.  It would not matter.

22             Whether she was--whether you're having

23             pre-term labor or not can be important and

24             whether the--of the fetus is viable or not

25             can be important.
```

94

1    Q    Do you know if Dr. Baldwin's office
2         determined a due date?
3    A    I'm quite sure they did as every OB doctor
4         does.  Yes, I'm quite sure they did.
5    Q    Do you know what methodology they used in
6         determining the due date?
7    A    Well, they probably recorded both of them,
8         as I just said.  They probably--I--the
9         short answer is no, but if you'd like for
10        me to look at her records I can probably
11        figure out how they calculated her due
12        date.
13   Q    Well, if--if it was done via ultrasound,
14        would that be shocking to you?
15   A    No.  That would be what I would expect.
16   Q    What if on the afternoon of Monday,
17        May 15th Ms. Love's due date was May 10th
18        of 2017?  Would that be something you'd
19        want to know?
20   A    The--the short answer is--you're
21        going--if--if you're going to ask me
22        questions about this I need to review both
23        Dr. Baldwin's record about what he said
24        about the due date.  And also, if you'll
25        recall, Ms. Love went to a hospital a

95

1       couple of weeks before, and I want to see

2       what they said about her due date, as well,

3       if you want to ask me more--more questions

4       about that.  But--but broadly, no, she

5       wasn't having signs of labor, so it would

6       not matter.  As long as it was--well, she

7       wasn't having labor symptoms.  She was

8       going to go to an OBG--GYN doctor in two

9       days.  So if she developed labor symptoms

10      in those times, it would matter, but

11      without labor symptoms it would not matter.

12   Q   So your testimony to the ladies and

13      gentlemen of the jury is that on Monday,

14      May 15th of 2017 it just really wasn't

15      important that SHP have Dr. Baldwin's

16      records with Dr. Baldwin being the treating

17      O--OGBYN--O--OBGYN for Ms. Love?

18   A   Well, that's your characterization of it,

19      not mine.

20   Q   You're not an OBGYN, we've established that

21      correctly; correct?

22   A   That's correct.

23   Q   Would you defer to the opinion of an OBGYN

24      if it differed from yours relative to the

25      care of a pregnant female?

96

1    A    In a jail setting, yes.  But number one, I

2         have my own opinions.  I would not defer to

3         anyone else.  Now objectable opinions might

4         be outside my area of expertise in certain

5         cases, but, no, I wouldn't defer to an

6         OBGYN.

7    Q    You haven't had the training that an OBGYN

8         has regarding the care of a pregnant

9         female; correct?

10   A    Well, just like an OBGYN has not had the

11        training I--in emergency care patients,

12        including pregnant patients, and has not

13        had the training and experience and

14        expertise in care--delivering care in a

15        correctional setting, we all have our

16        different areas of expertise.  But you are

17        correct, I'm not an OBGYN.

18   Q    All right.  Let me take you--sorry.  Let me

19        get my [inaudible].  Let me take you to

20        page 11 of your report and let's go to

21        paragraph 14.  And I believe this is

22        [inaudible] May 15th, and we're now

23        transitioning into the morning hours of

24        May 16th; is that correct?

25   A    That's correct.

97

1    Q    And you note that the first indication of

2         any medical complaint is a notation of

3         screaming from 4:35 a.m. until 5:15 a.m.;

4         correct?

5    A    Correct.

6    Q    Based upon your experience as a medical

7         doctor in an institutional setting, is it

8         common for inmates to scream?

9    A    Could you repeat the question, please?

10   Q    Well, based upon your experience as a

11        medical doctor in an incarceration setting,

12        is it common for inmates to scream about a

13        variety of topics?

14   A    It occurs.

15   Q    Is it common for inmates to say something

16        to the effect, help me, please, get me out

17        of here?

18   MS. BRANNON:      Object to the form.

19   A    No, I don't think that's necessarily

20        common.

21   Q    If you go down to paragraph 15, you quote

22        the report completed by Brandi Upton

23        relative to the 5:15 a.m. call.  Do you see

24        that?

25   A    I do.

98

1    Q    My question to you is that:  Do you have

2         any reason to believe that the report that

3         Ms. Upton gave is anything but accurate?

4    A    Let me read that report.

5    Q    Take your time.

6    A    Okay.  So your--your question again?

7    Q    Do you have any belief--any reason to

8         believe there's any inaccuracies stated in

9         Ms. Upton's report to [inaudible] cut and

10        paste it in paragraph 15 of your report?

11   A    Well, the report is what it is.  I have

12        also reviewed the body cam--the body cam

13        footage of this same incident, and I don't

14        believe there--I--I would not call them

15        exactly--exactly alike descriptions of the

16        events.  But--

17   Q    Well, are there any inconsistencies that

18        impact any opinion you're going to offer

19        today?

20   A    Not that I--if you're asking if--if--if

21        there's anything about that that--that

22        changes what opinions I'm planning to

23        offer, the answer is no.

24   Q    Okay.  On the morning of May 16th, SHP

25        still did not have Dr. Baldwin's records;

99

```
 1         is that correct?

 2    A    That is correct.

 3    Q    Is it also correct that SHP was not certain

 4         as to Ms. Love's due date?

 5    A    I don't--I--no, I don't--I--I'm not going

 6         to say one way or the other.  I don't know

 7         the answer to that.

 8    MS. BRANNON:      Well, hold on a second, guys.

 9                      Sorry.  I just got

10                      interrupted, but--but I'm

11                      good.

12    MR. HARNICE:      All right.

13    Q    As a--based upon your education, training

14         and experience as a medical doctor and

15         based upon how Ms. Love [inaudible] up

16         until this point at 5:15 a.m. on May 16th

17         of 2017, would it cause you concern

18         [inaudible]?

19    COURT REPORTER:   Paul, you are breaking up.

20    MR. HARNICE:      I don't know what to do about

21                      it.  I'm pointing in the exact

22                      same direction, talking as

23                      I've always talked.  Can

24                      you-all hear me?

25    MS. BRANNON:      We can now.
```

100

```
 1   Q    So my question is:  Based upon your
 2        education, training and experience as a
 3        medical doctor and based upon how Ms. Love
 4        had presented herself up to this point
 5        on--at 5:15 a.m. on Monday--I'm sorry, on
 6        Tuesday, May 16th, the fact that Ms. Love
 7        [inaudible]--
 8   COURT REPORTER:   Yeah, you're going to have to
 9                     repeat that.  Sorry.  Your
10                     last part just went totally
11                     out.
12   Q    My question is is:  Based--based upon--
13   COURT REPORTER:   Wait.  I think we've lost--
14   MS. BISHOP:       Hang on.  Do we have
15                     Dr. Fowlkes--
16   MS. BRANNON:      We've lost Dr. Fowlkes now.
17   MS. BISHOP:       I think we've lost
18                     Dr. Fowlkes.
19   COURT REPORTER:   We've lost Dr. Fowlkes now.
20   MR. HARNICE:      You want me to go ahead?
21   COURT REPORTER:   No.
22   MS. BRANNON:      Without Dr. Fowlkes?
23   COURT REPORTER:   We don't have a witness.
24   MR. HARNICE:      That's a joke.
25   MS. BISHOP:       All right.  Let's, I guess, go
```

101

```
 1                        off for a couple minutes.
 2   MR. HARNICE:      However you-all want to do it.
 3
 4   VIDEO TECHNICIAN: Just off the record.  We can
 5                        all stay on.
 6        (OFF THE RECORD)
 7   VIDEO TECHNICIAN: We're back on the video record
 8                        at 3:33.
 9   By Mr. Harnice:
10   Q    Dr. Fowlkes, based upon your education,
11        training and experience, can--if a woman is
12        eight months pregnant, can a complaint of
13        lower back pain and leg pain be a sign of
14        labor?
15   A    Based upon my training, education and
16        experience, it could be.
17   Q    So let's go to paragraph 15 of your co--of
18        your report.  And we're [inaudible]
19        Ms. Upton's report that you had cut and
20        pasted into your report.  Do you see that?
21   A    Which page number?
22   Q    It's paragraph 15, page 11.  It's on the
23        screen there.
24   A    Yes, I see it.  I'm there.
25   Q    All right.  So this is the early morning
```

102

1          hours of May 16th of 2017; correct?

2    A     That is correct.

3    Q     SHP still has not received Dr. Baldwin's

4          records; is that correct?

5    A     That is correct.

6    Q     It appears that Ms. Love is complaining

7          about lower back pain and that her legs

8          hurt; is that correct?

9    A     That is cor--that's what the--that's what

10         the deputy records of her complaints in

11         this--in this incident report.  Yes, that

12         is correct.

13   Q     Do you have any reason to believe that the

14         deputy did not tell Nurse Sherrow about the

15         complaint of lower back and legs hurting?

16   A     I do not.

17   Q     So now as--as--based upon your education,

18         training and experience as a medical

19         doctor, would you be concerned about this

20         report and not having Dr. Baldwin's records

21         to refer to?

22   A     As--as it relates--so--so those are two

23         different questions, but as phrased, no, I

24         would not.

25   Q     So it appears that--you previously told me

103

```
 1        that lower back pain and legs hurting can

 2        be a sign of labor; correct?

 3   A    I'm--I recognize that as a physician; yes.

 4   Q    And it appears that Ms. Love is reporting

 5        those two very conditions; correct?

 6   A    Among others.

 7   Q    And if--if you go down to paragraph 16 in

 8        Ms. Sherrow's notes she asks her if she's

 9        had any vaginal discharge or bleeding;

10        correct?

11   A    That is correct.

12   Q    Is it your belief that Ms. Sherrow's

13        concern at this point in time is that

14        Ms. Love may be going into labor?

15   MS. BRANNON:      Object to the form.  You may

16                     answer.

17   A    She's asking questions of--it is a

18        reasonable--it is a reasonable--not

19        speculation.  I'm trying to think of the

20        word.  It's a reasonable presumption to

21        believe that a nurse who is being called

22        about a patient in pre-term labor would be

23        asking questions to determine that.  Yes,

24        that is a reasonable presumption.

25   Q    And especially at 5:15 a.m. in the morning;
```

104

1      correct?

2   A   No, that doesn't have any relevance to it.

3      She's not there.

4   Q   It's--it's 5:15 a.m. in the morning and

5      they're not calling about a hangnail;

6      correct?

7   A   I--I--I can't speculate about that.  I

8      mean, in this particular case, they're

9      calling about an inmate who's screaming and

10      complaining who had been--who had been in a

11      psychotic or near psychotic state yes--the

12      day before and had required restraint and

13      was on a suicide watch.  So they're calling

14      about complaints of an inmate under those

15      circumstances who was also pregnant.

16   MS. BRANNON:      All right.  Let me--let me

17                     go--give me two seconds.

18                     We're going to go on mute.

19   COURT REPORTER:   Angela, we need to spotlight

20                     the witness again.

21   MR. HARNICE:      We can go back on.

22   MS. BRANNON:      I don't even know what that

23                     means.

24   COURT REPORTER:   That means he's in the center

25                     right there.  Okay.

1   MR. HARNICE:      Are we back on?  I guess we

2                     never went off.  Am I good to

3                     ask questions?  Am I good to

4                     ask questions?

5   MS. BRANNON:      I'm fine with that.

6   VIDEO TECHNICIAN: That's fine.  I was muted.

7                     Yes, we're good.

8   By Mr. Harnice:

9   Q    All right.  Dr. Fowlkes, you had just

10       talked about there was a concern--Nurse

11       Sherrow--it was reasonable for her to be

12       concerned about pre-term labor.  Is that

13       what you said?

14  A    No.

15  Q    What did you say about pre-term labor?

16  A    Well, I--if I--if I used the word pre-term,

17       I--what I should have said was it was

18       reasonable for Nurse Sherrow to be

19       concerned about whether Ms. Love was having

20       symptoms referable to labor.

21  Q    Because you would agree with me at this

22       point in time as a result of not having

23       Dr. Baldwin's records there's no way of

24       determining--no way of [inaudible] whether

25       as pre-term labor or not; correct?

106

1   A    I would not agree.

2   Q    Well, do you--and it's on--at 5:15 a.m. on

3        May 16th of 2017, what information can

4        Nurse Sherrow base an opinion that Ms. Love

5        was going through pre--potentially going

6        through pre-term labor?

7   A    I don't understand the question.  But Nurse

8        Sherrow had some understanding of what

9        Ms. Love had said her due date was.  And so

10       we--if that is past a certain time, it

11       would not be pre-term labor but would be

12       labor.  And Nurse She--I don't recall as we

13       sit here today without looking at the

14       record what that expected due date was and

15       what, therefore--how many weeks prior to

16       that it was.  But it was my understanding

17       that they felt that she was in the later

18       stages of pregnancy and it wouldn't be

19       pre-term labor but would, in fact, be labor

20       if she had those symptoms.

21  Q    Okay.  The bottom line is, based

22       upon--would you agree with me that based

23       upon the questions that Nurse Sherrow asked

24       that she had a legitimate concern about

25       Ms. Love potentially being in labor?

107

1    A    What--I would agree that she knew she was

2         late--however, I will agree that she knew

3         she was late term pregnancy and if she was

4         being called about complaints, yes, one

5         of--it would be very reasonable for her to

6         wonder whether she could be going into

7         labor and you ask questions about that.

8         Yes, I do agree with that.

9    Q    And then is it your understanding that

10        Nurse Sherrow informed the jail employees

11        to continue to monitor her and advise Nurse

12        Sherrow of any changes?

13   A    Well, that amongst the thing, so one other

14        thing that she knew or advised them was

15        that she was reporting to work in less than

16        two hour or--in--in, approximately, two

17        hours, so she would be there shortly.  She

18        also would reasonably have known that

19        Ms. Love was on every ten minute checks.

20        So this is not just someone in general

21        population that might or might not be able

22        to effectively get the attention of the

23        corrections officer.  She's being checked

24        by the correctional officers every ten

25        minutes.  So, yes, she said to--when--when

108

1        determining that she did not have bleeding,

2        did not have discharge, Nurse Sherrow

3        appropriately concluded that she should be

4        able to come check on her when she got

5        there in, approximately, two hours and to

6        call her back if she had problems in the

7        meanwhile.

8    Q   And it looks like from--if you go to

9        paragraph--page 13, paragraph 20 of your

10       report, that you have determined that, SHP

11       RN arrived at Franklin County Regional Jail

12       at approximately 7:35 a.m.; is that

13       correct?

14   A   That is correct.

15   Q   So that would have been 2 hours and 20

16       minutes after the call; correct?

17   A   Okay.  I agree.

18   Q   During that 2 hours and 20 minutes between

19       5:15 a.m. and 7:35 a.m. when Nurse Sherrow

20       arrived at the jail, do you know if

21       Ms. Love's condition changed at all?

22   A   I--I--I do know some amount--some amount

23       about that.  So, for instance, there is

24       a--an incident report about a supervisory

25       security staff arriving at 6:30 and she is

109

1    still screaming.  There are--I also know

2    that she became quiet some during that

3    time.  So--and--and I know what's recorded

4    on the ten minute observations.  So to the

5    extent that her condition either got worse

6    or got better or stayed the same, that

7    could probably be interpreted a number of

8    ways.  I--I looked at all of those pieces

9    of information.

10   Q   Would you describe that as erratic

11       behavior?

12   A   Would I describe what as erratic behavior?

13   Q   Well, what you just described to us, that

14       there was some screaming and then some

15       quiet.  You know, you--you were referencing

16       notes that are contained in your report.

17       But my question to you is:  Would you

18       describe that as erratic behavior?

19   A   I would describe it as similar to the

20       behavior Ms. Love had demonstrated

21       throughout the time she had been at the

22       Franklin County Jail, yes, and--and it was

23       erratic.  Yes, I will--will agree to that.

24   Q   And would you also agree that that erratic

25       behavior is similar to what was described

110

1    in Ms. Upton's 5:15 a.m. report?

2  A    I would agree to that.

3  Q    So my question to you is:  During that 2

4    hours and 20 minutes between 5:15 a.m. and

5    7:35 a.m. when Nurse Sherrow

6    arrived--arrived at the jail, are you aware

7    of there being any changes in Ms. Love's

8    behavior?

9  A    That's essentially the same question you

10    asked before, and I will give you the same

11    answer.  There is lots of continued erratic

12    behavior, and there are also, I believe,

13    videotapes of that time.  To the extent

14    that she either complained more or less,

15    I--I don't see evidence of that.  I--I'm

16    not planning to offer an opinion that that

17    did occur.  I don't know for certain one

18    way or the other.  There is some

19    information about it.  Some of that

20    information may show that she was screaming

21    more loudly, less loudly, she was quiet.  I

22    don't have information specifically one way

23    or the other about that.  I know that the

24    correctional officers didn't feel there was

25    a change in her condition, or at least not

111

1    enough for him to call Nurse Sherrow back.

2  Q   And do you think that was an appropriate

3      action on the part of the correctional

4      officer?  Let me--actually, let me ask it a

5      different way.

6  MS. BRANNON:       Object to form.

7  Q   Let me ask it this way:  Did you see any

8      reason that a correctional officer should

9      have called Ms. Sherrow back in-between

10     5:15 a.m. and 7:35 a.m.?

11 MS. BRANNON:       Object to the form.

12 A   Well, I was not retained for the purposes

13     of evaluating, in this particular case, the

14     off--the actions of the correctional

15     officer.  In--correctional officers in this

16     case.  That was not the thrust of my review

17     of the records, and so I did not review all

18     of those in detail, and I don't have an

19     opinion one way or the other about that.

20 Q   Well, Ms.--you--you agree with me that

21     Ms. Sherrow asked that the--the jail keep

22     her posted of any changes; is that

23     accurate?

24 A   That's correct.

25 Q   Based upon the documents you've reviewed

112

1        and what you've seen in this case, were

2        there any changes that warranted a jail

3        employee calling Ms. Sherrow for a second

4        time in-between 5:15 a.m. and 7:35 a.m.?

5   MS. BRANNON:      Object to the form.  He's not

6                     been called as a correctional

7                     officer's expert.

8   A    I--I will agree that they did not call her

9        back.  I did not specifically review their

10       actions as to whether they should have or

11       should not have.

12  Q    Do you know of anybody--any employee of the

13       Franklin County Regional Jail ever failed

14       to follow an instruction by an SHP

15       employee?

16  MS. BRANNON:      Object to the form.

17  A    I don't have an opinion about that.

18  Q    Well, do you--are you aware of any

19       fact--are you aware of any factual basis

20       where a jail employee failed to follow an

21       instruction given by an SHP employee?

22  MS. BRANNON:      Object to the form.

23  A    Nor vice versa.  I'm--I'm aware of--I'm

24       aware of nothing to that regard either way.

25  Q    Do you know when Ms. Love's water broke?

113

1   A    I do not.

2   Q    Do you know if Ms. Love ever had--do you

3        know if Ms. Love had vaginal bleeding?

4   A    Yes, I do.  Well, I--I know that there is

5        blood associated with delivering a baby.  I

6        know that she delivered a baby and she had

7        some blood from the placenta at that time.

8        If you're talking about prior to that, I

9        don't--there's no information in the record

10       that she did that I know of.  And in fact,

11       that's what Nurse Sherrow asked about, and

12       that's what the correction officer said

13       would--had not occurred according to that.

14  Q    Do you know what time Ms. Love began

15       bleeding?

16  A    No.  I mean, this is--might be an obvious

17       answer but around the time she delivered

18       the baby, whatever time that was.  We

19       believe that was shortly before 7 a.m.

20       but--

21  Q    You believe Ms. Love gave birth before

22       7 a.m.?

23  A    I be--I believe that the--the--that the

24       last ten minute log check was around 6:38,

25       6:4--so I--I thought it had said 6:30.

114

1      We--it could also have said 6:38.  I

2      believe there was other testimony in the

3      record that it occurred around 6:40.  And

4      so, yes, I--I do believe that she gave

5      birth between that time--I'm sorry.  I may

6      be getting mixed up.  Hold on--hold on a

7      minute.  It's--it's after the last check

8      and I need to verify if that's 6:30 or 7.

9      Hold on a minute.  I believe I might be off

10     by an hour.  Hold on.  I'm sorry.  Between

11     7:40 and 8 a.m.

12  Q   That's when she had the baby?  Is that your

13     testimony?

14  A   I--I don't know that I can say that to a

15     reasonable degree of medical certainty.

16     What I--what I can say is that she had the

17     baby sometime prior to 8 a.m., and the last

18     assessments don't see a baby, don't see

19     blood, so it's a reasonable presumption

20     that it occurred in the 20 minutes between

21     7:40 and 8 a.m.  But I--I don't know that

22     I'm prepared to offer an opinion about the

23     exact time that she delivered; no.

24  Q   If you go to paragraph 19 of your report,

25     you cut and paste a report made by Officer

115

1          Michael Todd Phillips; is that correct?

2    A     That's correct.

3    Q     If you go down--well, just let me read it.

4          It's where, on 5/16/2017 at, approximately,

5          8:03 I was conducting medicine pass with

6          Nurse Sherrow when we arrived at cell 113A

7          in booking to check on inmate Kelsey

8          Gabrielle Love.  When I opened the door, I

9          immediately saw a large amount of blood

10         smeared on the floor across the entire

11         cell.  I had last checked on inmate Love at

12         approximately 7:38 and at that time she was

13         sitting on the bench in her cell and

14         quietly crying, which I did not find

15         unusual for an inmate who was withdrawing

16         from drugs, and et cetera, et cetera.  So

17         do you have any reason to believe that

18         Michael Todd--Officer Michael Todd

19         Phillips' report of 7:38 a.m. is not

20         accurate?

21   A     No.

22   Q     So instead of sometime between 7:40 and

23         8:03, I guess theoretically--well, strike

24         that.  Strike that.  Based upon the

25         5:15 a.m. phone call that Officer Upton

116

1       made to Ms. Sherrow, would you agree with

2       me that, based upon your education,

3       training and experience, that Ms. Sherrow

4       should have made it her prior--priority to

5       go see Ms. Love as soon as she got to the

6       jail?

7    A  Now, I believe she said that was what she

8       was going to do and I believe that is what

9       she did; yes.

10   Q  And so if Ms.--you--but--so is the answer

11      yes, that based upon the 5:15 a.m. phone

12      call Ms. Love should have been a priority

13      of Nurse Sherrow on the morning of

14      May 16th?

15   A  Well, not only should she have been, I

16      believe she was a priority of Nurse

17      Sherrow's.  So to the extent that you're

18      going to say that--you know, we--I don't

19      know the length of time that it takes to

20      check-in.  There are certain security

21      procedures.  So one cannot, for instance,

22      if she clocks in at 7:35, be seeing

23      Ms. Love at 7:36.  No, that's not

24      reasonable.  But she says in her incident

25      reports and in her reports that after she

117

```
 1        got to work I believe she started her
 2        morning pill pass and she was amongst--if
 3        not the first person that she saw, amongst
 4        the first people that she saw, and that
 5        would be reasonable.
 6    Q   So if--I mean, you haven't seen
 7        Ms. Sherrow's testimony; correct?
 8    A   I've seen Ms. Sherrow's documentation in
 9        the record.
10    Q   And so if Ms. Sherrow checked-in to her
11        computer at 7:35 a.m. in her office and if
12        Ms. Sherrow--Ms. Sherrow testified that it
13        would take her, approximately, two minutes
14        to walk from her office to Ms. Love's cell,
15        that would have put us at 7:37 a.m.;
16        correct?  Two minutes after 7:35 is 7:37;
17        correct?
18    A   I--I hear your--I--I hear your supposition
19        and I don't necessarily agree with it but I
20        understand what you're saying.
21    Q   Well, but my point being if--if Ms. Love
22        was Nurse Sherrow's priority and if she
23        checked-in at her desk at 7:35 and it would
24        take her two minutes to get to Ms. Love's
25        cell, would you agree with me that it would
```

118

1       be reasonable for Ms. Sherrow to have

2       gotten to the cell by, at least, 7:40 a.m.?

3    A  No, I would not.

4    Q  Would it have been reasonable for

5       Ms. Love--Ms. Sherrow to have gotten to the

6       cell by 7:45 a.m.?

7    A  Number one, it would have been

8       reasonable--we don't know exactly what time

9       she arrived.  We know what time they began

10       opening that cell.  So it would be

11       reasonable what occurred in this case.  She

12       is--describes a time of about 8:03 a.m.

13       that she and a correctional officer are

14       there.  There's security concerns within a

15       facility, such as a jail, where the nurse

16       cannot go unaccompanied into patient care

17       areas, she must wait on a security staff to

18       escort her.  There are doors which must be

19       unlocked, et cetera.  So I believe the time

20       frame in this case was reasonable, was what

21       you would expect, and was entirely

22       appropriate.

23    Q  And--but you have no idea what Ms. Sherrow

24       testified to, correct, and you're still

25       willing to opine on that?

119

```
 1   A    I am still willing to opine on that.  I
 2        know what Ms. Sherrow wrote in her
 3        documentation.  I have not read her
 4        deposition testimony.
 5   Q    Do you know if when
 6        Ms. Sherrow--Ms. Sherrow arrived--arrived
 7        at work whether or not she reached out to
 8        any jail employees and said, look, we need
 9        to get to Ms. Love's cell as quickly as
10        possible?
11   A    I do not know one way or the other.
12   Q    Would you have--based upon your education,
13        training and experience, would you have
14        expected Ms. Sherrow when she arrived at
15        work to make that kind of call to a jail
16        employee?
17   A    What I would have expected is that if
18        Ms. Love were still having the same
19        problems she had before, if she was still
20        screaming, still having problems that the
21        correctional officers would have called her
22        back or would have notified Nurse Sherrow
23        when she arrived.  And to the extent they
24        did not, then I think that--you know, that
25        it was reasonable what Nurse Sherrow and
```

120

1       the correctional officers did, which was

2       see her amongst the very first patients of

3       that morning.  I think all of that is

4       reasonable.

5  Q    But you would agree with me that if--if

6       Ms. Love's condition had not changed even

7       after Ms. Sherrow arrived at the jail,

8       there was no reason for the jail employees

9       to call Ms. Sherrow; correct?

10  A    Well, no.  I--so number one, no, even if

11       her condition had not changed, if the

12       correctional officers had felt that she was

13       in labor or was about to deliver a baby or

14       had delivered a baby even if her condition

15       was better as a result of having delivered

16       the baby, I would expect that if the

17       correctional officers were aware of any of

18       those things they would not only have

19       called Nurse Sherrow back but would have

20       simply called 911 and sent Ms. Love to the

21       hospital if they felt she was in labor or

22       delivering a baby.  That's what I would

23       expect.

24  Q    Well, you read Michael Todd Phillips'

25       report as to what he observed at 7:38 a.m.,

121

1         correct, in paragraph 19 of your report?

2   A   I did.  That--that she was quiet--you're

3         talking about--he's the gentleman that said

4         she was quiet at that time?

5   Q   Yes.

6   A   Okay.  Yes, I read that.

7   Q   Was there anything about that particular

8         report that you believe should have caused

9         him to call Nurse Sherrow at 7:38 a.m.?

10  A   What I believe about that report is she was

11        at that time quiet, which may reflect that

12        she had already delivered the baby.  We

13        don't know one way or the other; right?

14        She's not screaming.  We know she was

15        screaming at 5:15--at 4:35, we know she was

16        screaming at 5:15, and we know she was

17        screaming at 6:30.  We don't know beyond

18        that when she was or wasn't screaming,

19        except as you just pointed out, she was

20        quiet at 7:38.

21   Q   And she was sitting on a bench at 7:38;

22        correct?

23   A   That is what he says in his report; yes.

24   Q   Well, based upon that observation alone and

25        not seeing a baby, would you

122

1          agree--would--would there have been any

2          reason for Officer Phillips to call Nurse

3          Sherrow?

4     MS. BRANNON:        Object to the form.

5     A    Well, they didn't see the baby until they

6          looked--she had climbed down inside of her

7          mat.  She was also had been seen sitting on

8          a toilet at some other time.  So I simply

9          don't know when she delivered the baby or

10         what was visible or what wasn't visible

11         within the cell at that time and don't have

12         an opinion one way or the other about that.

13    Q    Would you at least agree with me that if

14         Nurse Sherrow after she got to the jail at

15         7:35 a.m. on May 16th, that based upon the

16         5:15 a.m. call that Ms. Love should have

17         been the first person she saw in med pass?

18    A    No, I wouldn't agree with that.  I--I mean,

19         there are all kinds of emergencies that can

20         come up that would change your priorities.

21         I agree that Ms. Love should have been

22         amongst the first people that she saw, as I

23         believe she was.  Now, whether the very

24         first person or whether there was some

25         other more higher priority emergency that

123

1       could possibly have occurred I--I--I can't

2       say.  You--as you just point out, Ms. Love

3       is quiet at this time, so she's no longer

4       yelling.  So if--if she saw someone else

5       and did something else first, I would not

6       think that was unreasonable at all.

7    Q  Are you aware of there being any other

8       emergencies that Nurse Sherrow had to deal

9       with on the morning of May 16th, 2017?

10   A  No.  But just like--just like you just said

11      should--would I agree that she should have

12      absolutely been the very first that she

13      saw, and I told you no, it depends on what

14      else was going on.  Something could have

15      taken a higher priority.  So you're--you're

16      making hypotheses about what could have

17      occurred, and I'm telling you what could

18      have--could or could not have occurred.  I

19      think she should have seen her relatively

20      quickly and amongst the first people, and I

21      believe that's exactly what happened.

22   Q  I'm not going off hypotheses; I'm going off

23      Nurse Sherrow's testimony.  So my

24      question--which you haven't seen; correct,

25      sir?  So my question to you is--you're

124

1       saying, well, no, there could be things

2       that came up that would take precedence

3       over what was described to Nurse Sherrow in

4       the 5:15 a.m. call and Ms. Sherrow--Nurse

5       Sherrow's need to see Ms. Love.  You're

6       saying there could be other things that

7       take priority.  For instance, if there was

8       a gun fight in the back of the jail, that

9       would be something that would probably take

10      priority if somebody had a gunshot wound--

11  MS. BRANNON:      Object to the--

12  Q   --right?

13  MS. BRANNON:      Object to the form; it's a--

14  Q   Is that what you're--

15  MS. BRANNON:      --compound question.

16  Q   That's--object to the form, that's--that's

17      a good objection.  Ms. Brannon is entirely

18      correct.  What--but my question to you

19      is, sir, that, if there were no other

20      emergencies on the morning of May 16th of

21      2017 and there were no other issues that

22      required Nurse Sherrow's attention and it

23      was just a normal morning, would you agree

24      with me that Nurse Sherrow should have seen

25      Ms. Love first?

125

1   A     No.

2   Q     Let's leave it at that.  How's that?

3   A     Well, no.  No.  If you're--I mean, the

4         reason I'm saying that is that when--when

5         one is beginning to make med pass or

6         beginning to see people, if, for instance,

7         there was one--was walking down a line of

8         cells and there was one cell ahead of--or

9         two cells or three cells ahead of

10        Ms. Love's and--and Ms. Love was not

11        yelling and had no apparent distress and

12        the correctional officers haven't told her

13        of any problem with Ms. Love, then--then

14        saying that she absolutely needs to be the

15        first, not the second, not the third in a

16        line of people and that they need to--she

17        and the security officers need to, you

18        know, deviate from the normal thing to see

19        them, I will not agree to that.  I do think

20        that she saw her in a reasonable time

21        frame.  She got there at 7:35, she sees her

22        by around 8:00.  I think that's very

23        reasonable.  And whether she was or wasn't

24        the very first person she saw or not is, I

25        do not believe, material.

126

1    Q    Do you know if Nurse Sherrow was aware of

2         the observation made by Officer Phillips at

3         7:38 a.m.?

4    A    I do not know one way or the other.  I

5         would not expect that she would, but I--I

6         don't know one way or the other.

7    Q    Do you know if Ms. Sherrow had received any

8         information regarding Ms. Love after the

9         5:15 a.m. call?

10   A    I do not know for certain one way or the

11        other.

12   Q    So if Ms. Sherrow testified that she did

13        not receive any other information after the

14        5:15 a.m. call, would you agree with me

15        that Ms. Love should have been the first

16        inmate that Ms. Sherrow saw on the morning

17        of May 16th, 2017?

18   A    I've already answered that question several

19        times.  I'll be glad to repeat my answer,

20        though.  I think she should have--

21   Q    But you qualified it by saying, well, you

22        know, she was sitting quietly so Nurse

23        Sherrow--what I'm saying is, sir,

24        after--after 5:15 a.m. Nurse Sherrow didn't

25        receive any additional information

127

1       regarding Ms. Love good or bad; okay?

2       We--let's go on that premise.  The last bit

3       of information that Ms. Love received--or

4       that Ms. Sherrow received was at the

5       5:15 a.m. call.  So my question to you is:

6       Based upon your education, training and

7       experience as a medical doctor and based

8       upon what Ms. Sherrow knew about Ms. Love

9       when she entered the jail at 7:35 a.m.,

10      would you agree with me that Ms. Sherrow

11      should have made Ms. Love her number one

12      priority if there were no other emergencies

13      going on?

14   A  Well, I disagree with your premise that she

15      received no additional information.  So

16      even if she wasn't called back, when she

17      entered the jail she would have heard that

18      Ms. Love was no longer screaming.  So she

19      would receive that information through her

20      ears as she came into the jail.  And I

21      believe that she should make her a high

22      priority that morning and that she should

23      see her amongst the first patients that she

24      was going to see that morning, and I

25      believe she did that and I believe that her

128

1        actions were reasonable in that regard.

2  Q    How do you know Ms. Love was--Ms.--I'm

3        sorry.  How do you know Ms. Sherrow was

4        told on the morning of May 16th of 2017

5        when she arrived at the jail that Ms. Love

6        was no longer screaming?

7  A    I didn't say that.

8  Q    Do you know if Ms. Sherrow was told

9        anything about Ms. Love in-between the

10       5:15 a.m. call and when she went to the

11       cell at 8:03 a.m.?

12  A   As I said, she would have--she would have

13      been able to identify--most--again, I

14      cannot speak to the--exactly about the

15      circumstance of this, but Ms.--Ms. Love was

16      housed in an area that was near the booking

17      area, and Nurse Sherrow would have under

18      most circumstances been able to hear

19      whether Ms. Love was screaming or not when

20      she was in the area of the booking area.

21      That's what I was saying.  She would have

22      not--she did not hear her screaming if one

23      believes the 7:38 report that she was quiet

24      at that time.

25  Q    Do you know where Nurse Sherrow's office is

129

1      in relation to the booking area?

2  A   Not specifically; no.  I know that she

3      would have had to have been in the booking

4      area when she--when she came and when she

5      was beginning her--her med pass.

6  Q   And so if that's the case, would it not

7      follow that she should have seen Ms. Love

8      first?

9  A   I've already answered it several times.

10     I--I think she should be among the first.

11     If there was a cell before she got to

12     Ms. Love's, I think stopping and giving

13     that person a pill would be perfectly

14     reasonable rather than causing potential

15     security or logistics problems by going

16     out--out of the normal order.  I think that

17     she did see her within 20--at--at--at the

18     very most, within 25 or 28 minutes of

19     arriving, and I believe that's perfectly

20     reasonable under the circumstances.

21 Q   If Ms. Love--well, strike that.  If

22     Ms. Sherrow arrived at the--her work

23     station at 7:35 a.m. and it took her two

24     minutes to walk to Ms. Love's cell after

25     checking in, that would have put her there

130

1          at 7:37 a.m. had she done that; correct?

2      A   I--I follow your logic but that goes more

3          to what I'm saying before.  She was close

4          by her, so she would have heard if she was

5          yelling.  She wasn't yelling at that time

6          and she was close enough--normally within a

7          jail you can hear--again, I--I don't know

8          one way or the other.  I understand what

9          you're saying that--take 7:35 plus two

10         minutes equals 7:37, but in a jail setting

11         one has to wait on the security officer

12         who's going to accompany you, one has to

13         wait on the control room to open doors, one

14         has to secure the equipment that they're

15         going to--to secure the--there's a lot of

16         logistical and security issues which apply

17         in a correctional setting that don't apply

18         in other settings.

19     Q   And if Ms. Love's (sic) testimony was that

20         taking all of that into account she went

21         through very specific detail as to where

22         her office is located in the jail

23         [inaudible] need to be opened by the jail

24         staff and if her testimony was that it

25         typically would have taken her two minutes

131

```
 1          from her office to Ms. Love's cell, that
 2          had she left at 7:35 and had she gone about
 3          that process, she would have gotten to the
 4          cell at 7:37, approximately.  Would you
 5          agree with that, sir?
 6   MS. BRANNON:       Object to the form.  You may
 7                      answer again.
 8   A    So, number one, I believe you used Ms. Love
 9        and you meant Ms. Sherrow.
10   Q    Yeah, I meant Ms. Sherrow.  I'm sorry.
11   A    Presuming you meant Ms. Sherrow, I think
12        I've answered it multiple times.  I don't
13        know all the specifics.  If you would like
14        to show me exactly what you're talking
15        about in Ms. Sherrow's deposition testimony
16        I can tell you whether I agree to it
17        or--agree with it or not.  But I--I'll just
18        tell you I've answered that question
19        multiple times and I don't know how to say
20        it differently.
21   Q    Well, let me ask this question then.  Had
22        it actually taken three minutes then
23        they--Ms. Sherrow would have gotten to the
24        cell at, approximately, the same time that
25        Michael Todd Phillips was performing his
```

132

```
 1            7:38 a.m. check; correct?

 2   A     Well, that's presuming that she could start

 3         doing anything at exactly 7:35.  There are

 4         often security issues, there are logistical

 5         issues within a jail.  I don't know what

 6         time she could actually start her med pass.

 7         As a for instance, I do not know how many

 8         doors she had to open to get where she was

 9         going, where she was going to get her med

10         pass cart, how long it took the officer

11         that was going to accompany her to be

12         there, whether there was any report going

13         on, or whether--I--I just don't know all of

14         those things.  If you'd like to show me

15         what-all her deposition testimony is, I can

16         tell you whether I think it was reasonable

17         based upon that.  But based upon what I

18         know about the case records and

19         Ms. Sherrow's actions, I believe her

20         actions were reasonable on that point.

21   Q     And after--if all--the only information

22         Nurse Sherrow had was--

23   A     Can you--

24   Q     --a 5:15 a.m. call, would you--

25   A     Can you--can you stop for a second?  I'm
```

133

1      about to cough.  I'm going to mute the--I'm

2      going to mute the thing; okay?  Sorry.  I

3      got a tickle in my throat.  I knew I was

4      about to cough and I wasn't going to be

5      able to hear you.

6   Q   So if the--the off--the only information

7      that Ms. Sherrow had was the 5:15 a.m. call

8      from Ms. Upton, would you agree with me

9      that Nurse Sherrow should have had some

10      amount of urgency in getting to Ms. Love's

11      cell on the morning of May 16th?

12   A   I would agree that not only should she

13      have, I would agree she did.

14   Q   All right.  Let me get you to turn to

15      page 16 of your report and subsection D

16      there.  It's actually is paragraph--I'm

17      sorry.  It's actually paragraph 22,

18      subsection D.

19   A   I'm there.

20   Q   And you write, the baby boy born at

21      approximately 36.5 weeks gestation.  Now,

22      that was a determination that was made

23      after the fact of the birth; correct?

24   A   I believe that's correct.

25   Q   All right.  If you'd go to page 19--I

134

1       mean--I'm sorry.  Go to the bottom of page

2       18.  You begin at the bottom of page 18,

3       you express your opinions; correct?

4    A  That's correct.

5    Q  And if you go over to the following page,

6       you've got Rom--Roman Numeral Number I, it

7       looks like at the top; is that correct?

8    A  That's correct.

9    Q  And then underneath that is paragraph 1; is

10      that correct?

11   A  That's correct.

12   Q  And it says--second paragraph, that--that

13      says, Ms. Love--or actually first sentence,

14      Ms. Love had a receiving screening

15      completed by a CO shortly after arrival.

16      That assessment found that Ms. Love was

17      pregnant and had recently been abusing

18      substances.  So is that--are you talking

19      about the corrections officer who performed

20      the screening in the early morning hours of

21      Sunday, May 14th?

22   A  I am.

23   Q  Then if you flip over to page 20,

24      paragraph 4, you write, on Monday, May 15th

25      SHP nursing staff determined that Ms. Love

135

1       was, in fact, pregnant.  Is it your--are

2       you offering testimony to the ladies and

3       gentlemen of the jury that Ms. Sherrow did

4       not know if Ms. Love was pregnant on

5       May 14th of 2017?

6  A   No.  It was--it is my opinion--it is my

7       opinion and the record shows that she did

8       not tell the arresting officer that she was

9       pregnant and then she told the booking

10      officers, and then she denied being

11      pregnant and said she was just fat to Nurse

12      Sherrow on the morning of the 14th.  But by

13      the--at least by the next morning they had

14      verified--I mean, I'm--I'm certain they

15      suspected that she was pregnant, but people

16      can say they're pregnant and they're not,

17      et cetera.  They had confirmed that she

18      was, in fact, pregnant.  She'd admitted it

19      or whatever by the next morning.

20  Q   Well, that's--so she--let's get back, let's

21      dissect that.  She confirmed it or

22      whatever.  How--what--on--on May 15th of

23      2017, what information did the SHP nursing

24      staff receive to make and determine that

25      Ms. Love was, in fact, pregnant as of--on

136

1   May 15th of 2017?

2   A   She admitted it to them.

3   Q   Do you know if Ms. Sherrow had formed an

4       opinion as to whether or not Ms. Love was

5       pregnant when she examined her in the

6       restraint chair in the early morning

7       hour--at 7:01 a.m. on May 14th?

8   A   I have an educated guess, but I do not know

9       to a reasonable degree of medical

10      certainty.

11  Q   All right.  Let's go to page 21.  Actually,

12      let's go to the bottom of page 20,

13      paragraph 6.  You write, I did not find any

14      evidence in the records I reviewed of

15      Ms. Love complaining of any symptom which

16      could reasonably be related to labor until

17      4:35 a.m. on the morning of 5/16/2017.  Did

18      I read that correctly?

19  A   You did.

20  Q   At this time Ms. Love was screaming.  The

21      security staff--I'm on page 21 now.  The

22      security staff could not get Ms. Love to

23      articulate clearly what her problem was.

24      They certainly could have simply summoned

25      an ambulance had they felt she was in labor

137

1       or required immediate transport to the

2       hospital.  Did I read that correctly?

3    A  You did.

4    Q  All right.  Let's go to the next paragraph.

5       The security staff called an SHP nurse who

6       asked for appropriate additional

7       information.  Let me stop there.  Are you

8       talking about the 5:15 a.m. call?

9    A  I am.

10   Q  Then it says, including whether the

11      patient's water had broken and whether she

12      was having vaginal bleeding.  Given--given

13      the nurse's familiarity with Ms. Love's

14      prior bizarre behavior.  What bizarre

15      behavior are you speaking of there, sir?

16   A  Her bizarre behavior on the morning of the

17      14th when she had to be--when she was

18      giving inconsistent answers about whether

19      she was pregnant or not, she was saying

20      things that weren't making sense, she was

21      failing to follow commands and she required

22      chemical restraint, she required being put

23      in a restraint chair, she wouldn't tell

24      them for certain whether she was suicidal

25      or not.  Those are the indications of

138

1          bizarre behavior I was referring to.

2     Q    And these were indicate--this was

3          information that Ms. Sherrow had; correct?

4     A    As well as the correctional officers; yes.

5     Q    All right.  Let me read--start back with

6          that sentence.  Given the nurse's

7          familiarity with Ms. Love's prior bizarre

8          behavior and the information relayed by the

9          security staff, it was perfectly reasonable

10         and within the standard of care to tell

11         them that she would be at the facility

12         within a couple of hours and would assess

13         the patient further at that time.  Did I

14         read that correctly?

15    A    You did.

16    Q    Could Ms. Sherrow at--at that--at the

17         5:15 a.m. call, could Ms. Sherrow simply

18         summoned an ambulance had she felt that

19         Ms. Love was in labor or required immediate

20         transport to the hospital?

21    A    Yes.  Just like the officers could have

22         done that be--without even calling Nurse

23         Sherrow.  The--the officers could have

24         called an ambulance had they felt that she

25         was in labor or about to deliver a baby

139

```
 1         without even speaking with Nurse Sherrow.
 2         And, yes, you are correct had Nurse Sherrow
 3         reasonably thought that she was in labor
 4         she could have likewise done that.  So
 5         either one of them.
 6    Q    And couldn't Ms. Sherrow also have put her
 7         clothes on at 5:15 a.m. and driven in to
 8         the jail to examine Ms. Love for her
 9         own--with her own two eyes?
10    A    I do not know the answer to that question.
11    Q    Well, do you have any reason to believe
12         that there was anything that prevented
13         Ms. Sherrow from driving in to the jail
14         after the 5:15 a.m. call?
15    MS. BRANNON:       Object to the form.
16    A    Yes, I do not know one way or the other.
17    Q    Do you know how long of a drive it was from
18         Ms. Sherrow's house to the jail?
19    A    I do not.
20    Q    Do you know how long--how many minutes it
21         took for Ms. Sherrow to drive from her
22         house to the jail?
23    A    I do not.
24    Q    But you would agree with me that one option
25         that Ms. Sherrow had at that point in time,
```

140

1          potentially had some extenuating

2          circumstances, was she could have driven in

3          to the jail to examine Ms. Love with her

4          own two eyes?

5    MS. BRANNON:        Object to the form.

6    A     No, I would not agree.

7    Q     And why wouldn't you agree?

8    A     Well--

9    Q     Was it--why couldn't Ms. Love have just

10         gotten up, put her clothes on--

11   MS. BISHOP:        Ms. Sherrow.

12   Q     I'm sorry.  Why couldn't Ms. Sherrow just

13         have gotten up, put her clothes on after

14         the 5:15 a.m. call and driven in to examine

15         Ms. Love?  What prevented her from doing

16         that?

17   MS. BRANNON:        Object to the form.

18   A     Well, so as I told you before, I have not

19         reviewed the contract between the jail and

20         SHP.  I've also not reviewed the specific

21         job requirements of Nurse Sherrow as it

22         relates to on-call duty, her requirements

23         to--to go to the jail after hours to make

24         emergency calls there.  So I just don't

25         know enough about her job description or

141

1      the contract or the contractual

2      arrangements to be able to offer an opinion

3      about that.

4   Q  Well, if Ms. Sherrow testified that that

5      was an option that she could have pursued,

6      you would have no reason to disagree with

7      Ms. Sherrow; would you?

8   MS. BRANNON:      Object to the form.

9   A  I--I would just repeat the same answer I--I

10     said before.  I don't know the specifics of

11     the contractual arrangement between the

12     jail and SHP or SHP and Ms. Sherrow.  So I

13     don't have enough information to comment.

14  Q  The next sentence in that paragraph states

15     that, she also would have been aware that

16     the security staff was to be--was to be

17     checking Ms. Love every ten minutes and she

18     instructed the CO to call her back with any

19     changes in Love's condition.  Did I read

20     that correctly?

21  A  You--you left out Ms., but, yes, I'll spot

22     you, that was correct.

23  Q  Ms. Love's condition.  But I

24     included--I--well, okay.  Ms. Love's

25     condition.  So if there were--we've been

142

1        through the fact that if there were no

2        changes in Ms. Love's condition then there

3        would have been no reason to call; correct?

4        Did you hear me?

5    A   I--I--I heard you, and I--I wasn't just

6        necessarily--I mean, if they--not only just

7        changes in condition but if--if they--if

8        the--if the security officers would have

9        determined that they--that Ms. Love was

10       delivering a baby, if she said something

11       like, I feel better, but, oh, Lord, there's

12       a--there's a foot coming out or

13       something--so that would be not a worsening

14       condition but if they suspected that she's

15       now delivering a baby they would of course

16       be expected to not--not call Nurse Sherrow

17       back but just call an ambulance.  So

18       changes in conditions is a little bit vague

19       to the extent that there could be

20       information that they gained besides a

21       change in her condition which would cause

22       them to take some action.  I didn't see

23       that that occurred but I'm just saying it's

24       a little bit more than just changes in

25       condition.

143

1    Q    Are you saying that Ms. Sherrow gave vague

2         instructions to the jail to call her back

3         with changes in Ms. Love's condition?

4    MS. BRANNON:       Object to the form.

5    A    No.  I'm saying that reasonable

6         correctional officers would be expected to

7         take reasonable actions based upon

8         information which they learned aside from

9         any instructions given by Nurse Sherrow.  I

10        believe Nurse Sherrow's instructions were

11        plenty adequate, but I would not expect the

12        correctional officers not to use their own

13        knowledge as trained correctional officers

14        in addition to the instructions given by

15        Nurse Sherrow.

16   Q    And the same would apply for a--a

17        registered nurse; right?

18   A    If you're referring to use common sense in

19        addition to her nursing training, yes.

20   Q    And so if a nurse is going to use common

21        sense, would you agree with me that Nurse

22        Sherrow should have used common sense and

23        aired on the side of caution in calling an

24        ambulance at 5--after the 5:15 a.m. call?

25   A    I--I--I completely don't follow that logic

144

1          and don't agree.  If common sense would

2          have said that she was delivering a baby or

3          in labor, the correctional officers would

4          have done it.  So obviously the--the

5          correctional officers using their not just

6          common sense but using their information as

7          trained correctional officers didn't

8          believe that she was in labor.  They called

9          and asked for advice.  The nurse asked

10         reasonable questions.  And between the

11         nurse and the correctional officers they

12         determined there was no reason to call an

13         ambulance at that moment.  And I believe

14         that was a reasonable decision.  But, no, I

15         don't believe at that point that the nurse

16         should have concluded, wait a minute, these

17         correctional officers--I'm going to use

18         common sense and the correctional officers

19         don't know what they're telling me and I

20         need to call an ambulance.  No, I don't

21         believe that's reasonable at all.

22    Q    Do you know what the--look at the documents

23         you've reviewed.  You haven't reviewed the

24         expert report of Mr. Hurley, the

25         plaintiff's expert; correct?

145

```
 1   A    That is correct.

 2   Q    And you haven't reviewed his testimony,

 3        either; correct?

 4   A    That is correct.

 5   Q    If you go to paragraph--page 22, paragraph

 6        9, when--you say--you write, when the SHP

 7        nurse arrived to begin duty on the morning

 8        of May 16th she promptly went to check on

 9        Ms. Love.  Do you stand by that comment?

10   A    I do.

11   Q    If you go to page 23, Roman Numeral III,

12        you write, the Policies and Procedures SHP

13        had in place regarding health care at the

14        FCRJ were reasonable and within the

15        standard of care; correct?

16   A    That is correct.

17   Q    And we've already--well, strike that.

18   THE WITNESS:       It does not have to be now but

19                      I would request another

20                      bathroom break at your

21                      convenience, please.

22   MR. HARNICE:       Let's--let's go ahead

23                      and--let's go ahead and do it.

24   VIDEO TECHNICIAN:  Off the videotape record.

25        (OFF THE RECORD)
```

146

1          (A BRIEF BREAK IS TAKEN)

2     VIDEO TECHNICIAN:  We are back on the video

3                    record at 4:37.

4     By Mr. Harnice:

5     Q    All right.  Dr. Fowlkes, I should have

6          started at page 23 of your report.  And at

7          the bottom of that in Roman Numeral IV

8          [inaudible] within the other expert report

9          which I disagree on and/or which require

10         specific comments.  And if you then go over

11         to page 24 on paragraph 3, you say, opinion

12         section, first full--and we're talking

13         about Dr. Hall's report--opinion section,

14         first full paragraph, page 5, I do not

15         follow the logic of any opinion Dr. Hall

16         puts forth in this paragraph.  Can you give

17         me more specifics as to what your issues

18         are with Dr. Hall's opinion?

19    A    Yes.  I have referred directly to

20         Dr. Hall's report, and I am on page 5, and

21         the first full paragraph says--let--let me

22         just read to see if--and I'll see whether I

23         need to read it out loud.

24    Q    Why don't you just go ahead and read it out

25         loud for us.

147

1    A    Okay.  This particular pregnancy deserved

2         closer medical surveillance due to the

3         immediate or acute risks of withdrawal from

4         her admitted use of heroin and

5         methamphetamines and being in the third

6         trimester.  I would not have anticipated

7         that the officers/staff at the Franklin

8         County Regional Jail would appreciate those

9         risks but would expect them to defer to the

10        medical staff/personnel that was charged

11        with attending to the medical needs of the

12        jail's me--inmate population.  I would

13        expect said contracted medical staff's

14        judgment would trump any additional

15        training that the jail staff had or had not

16        received.

17   Q    Okay.  What problems do you have with that?

18   A    Well, the problems that I have with that

19        are that I would expect a trained

20        correctional officer to identify any acute

21        problems with intoxication or withdrawal

22        which required emergency medical treatment

23        and would obtain that treatment in the

24        absence of nurses being present.  Likewise,

25        the same goes for pregnancy and pregnancy

148

```
 1              related complications or, in other words,

 2              suspected labor.  I would expect that

 3              correctional officers could identify a

 4              person who is there and might be in labor

 5              and would take actions based upon that.  To

 6              the extent that they did not find those,

 7              then the nurse would--you know, would give

 8              advice, opinion and would, you know, give

 9              further orders, which all of those things

10              occurred in this case.  But I--I don't

11              understand what he's saying that--that she

12              was showing signs of labor and the

13              nurse--the correctional officers

14              weren't--weren't trained and couldn't

15              notice that but the nurse was and could

16              have on the phone.  I just don't understand

17              exactly what he's trying to say.

18    Q        Well, do you have any other

19              crit--criticisms of that particular opinion

20              of Dr. Hall?

21    A        Well, I think my original--what I put in my

22              report is I just don't follow the logic of

23              the paragraph, and that's--that's the basis

24              of--I mean, that's what I'm saying.  I

25              don't understand what that's saying there
```

149

1         at all.

2    Q    Based upon your education, training and

3         experience as a medical doctor, do you know

4         if there are any special risks associated

5         with a pregnant inmate who is withdrawing

6         from drugs?

7    A    I do.

8    Q    And what are those?

9    A    Depends on which drug we're talking about,

10        which class of drugs, and which trimester

11        of pregnancy we're talking about.

12   Q    Let's say opiate, withdrawing from opiates

13        in the third trimester.

14   A    Well, so you're--you're past the time

15        of--presuming you're past the time of

16        pre-term labor, the withdrawal from opiates

17        can cause or can be associated with

18        pre-term labor.  That would not be an issue

19        in this case.  There also is no evidence in

20        this case that Ms. Love developed

21        significant opiate withdrawal.  So I don't

22        believe this class of drugs is particularly

23        relevant in this case.  But, yes, there are

24        certainly conditions--the most important of

25        which is that the neonate can--can be

150

1        opiate dependent and can require treatment

2        for neonatal asthma syndrome, which again

3        we have no evidence occurred in this case.

4    Q   Based upon your education, training and

5        experience as a medical doctor, did you

6        expect correct--correction officers to know

7        the special risks associated with

8        withdrawal from opiates by a pregnant

9        inmate?

10   A   You--you said special risks and I do not

11       expect them to know the special risks or to

12       treat that.  I do expect correctional

13       officers to be able to identify persons who

14       are having serious problems with either

15       intoxication or withdrawal due to

16       substances, and I would expect them to take

17       reasonable action based upon that.

18   Q   Do you think there's any need for medical

19       staff to be at a jail for any period?  I

20       mean, what--is there a purpose that medical

21       staff should be in a jail?

22   MS. BRANNON:      Object to the form.

23   A   Perhaps you might need to rephrase the

24       question.  I'm not certain I understood it.

25   Q   We'll move on.  If you didn't understand

151

1       it, I--I don't know how to rephrase it.

2    A    Okay.

3    Q    If you go down to--well, actually, strike

4         that.  If you go to paragraph 25, you

5         critique--have comments on--

6    MS. BISHOP:       Hang on.

7    Q    --Mr. Edward Sweeney's--

8    MS. BISHOP:       Paragraph what?

9    MR. HARNICE:      Para--page 25.

10   MS. BISHOP:       Okay.

11   MR. HARNICE:      Sorry.

12   Q    Letter B.  You have comments regarding

13        Mr. Edward Sweeney's report; is that

14        correct?

15   A    That's correct.

16   Q    And in paragraph 2 you say, Number 68, I

17        strongly agree.  What is it that you

18        strongly agree about?

19   A    Just a moment.  I'm going to read the

20        paragraph with which I strongly agree.

21        Officer Upton and other non-medical

22        defendants did not directly contact the

23        Frankfort ambulance service or the

24        Frankfort Regional Medical Center before

25        discovering the newborn because they did

152

1      not believe the situation to be an

2      emergency.  There is no evidence that any

3      of the defendants knew or should have known

4      that Love was about to deliver a baby in

5      her cell.

6   Q  Okay.  Let's go to page 26 of your report.

7      We recall back earlier very early on in

8      your deposition we talked about the notice

9      which asked that you bring certain

10     documents with you to the deposition.  You

11     hadn't--

12  A  That's correct.

13  Q  --seen it before.  Do you recall that?

14  A  I do.

15  Q  And I said, well, when we get to the end of

16     this thing I'll ask you--and--and you also

17     gave some testimony about, well, you

18     weren't sure if Ms. Brannon had sent you

19     additional documents.  On page 26, you list

20     the facts or data considered by you in

21     forming the opinions that you've testified

22     to; correct?

23  A  That is correct.

24  Q  And you list, Number 1 is the complaint,

25     and then it goes all the way down to

153

1         Number 8 which are the expert reports of

2         Stephen Hall and Edward Sweeney; correct?

3    A    That is correct.

4    Q    Are there any other facts or data that you

5         considered in forming your opinions other

6         than what's set forth in this list?

7    A    The answer to that question is, at the time

8         of my deposition--I'm sorry.  At the time

9         of my report, no.  If you would like for me

10        to review my records and determine whether

11        Ms. Brannon has sent me additional

12        documents at this time, I--I will be glad

13        to do so and probably should.  I am--I

14        don't see it amongst this list the

15        videotape--the body cam videotape which I

16        have reviewed from the, essentially, 5:15

17        in the morning of--of the 16th.  I know

18        I've reviewed that.  It's not listed here,

19        so it must have been provided to me

20        afterwards.  I can see if there's other

21        documents as well.

22   Q    Well, here's what I want you to do is

23        comply with the notice of deposition that

24        was filed in this matter.  So if

25        you'll--when we get done with this if

154

```
 1          you'll go back and look at that notice of
 2          deposition and what I want for you to do is
 3          send to me the documents that are requested
 4          in that notice of deposition.  Will you
 5          agree to do that through Ms. Brannon?
 6     A    Well, I--I can be able to look right now,
 7          but Ms. Brannon obviously has the documents
 8          that she sent me and that is the only
 9          documents upon which I have relied.  So to
10          the extent you want me to look right now, I
11          will look and give you an answer to that
12          right now.  I don't need to send them to
13          you later.  I mean, Ms.--Ms. Brannon can--
14     Q    Okay.
15     A    --produce them but--
16     Q    How long is that going to take you?
17     A    Thirty seconds.
18     Q    Well, do it right now and--you mentioned
19          the videotape.  Is there anything else?
20     A    I--I will give you an answer to that
21          shortly.  I--I have reviewed my email and I
22          would ask--ask a request, please.
23 MS. BISHOP:      What's that?
24     A    Would someone put up the notice of
25          deposition and the documents that were
```

155

1    requested?

2    MS. BISHOP:        By someone, that would be me.

3                       Hang on.

4    Q    Let's start out with--

5    MS. BRANNON:       No.  That's for the--

6    MS. BISHOP:        I--I'm sorry.  I keep pulling

7                       up the wrong notice.

8    Q    The last sentence there where it begins,

9         the witness is directed to produce and

10        bring to the deposition the following

11        documents.

12   A    Yes.  I was trying to look at that list.

13        That's what I wanted to look at.  Okay.

14   Q    And my question to you to make it--to

15        simplify this and make sure I have all the

16        information I need, other than [inaudible]

17        you talked about regarding Ms. Upton,

18        are--is everything that's listed on page 26

19        of your report, is that all there is to

20        that--the list in the notice?

21   A    Yes.

22   Q    Okay.  So the video of--the Upton video or

23        whatever we want to term it is the only

24        additional item to that; correct?

25   A    Ye--that is correct.  I will just clarify

156

1       to say that's Officer Upton's body cam

2       video from, approximately, 5:15.  And all

3       the other items in there are compliant with

4       your request.  In other words, the current

5       CV, case list, et cetera.

6   Q   Let me show you next what I'm going to mark

7       as Exhibit Number--can somebody help me

8       here?

9   MS. BISHOP:        Hang on.  We are on--

10  COURT REPORTER:   40.

11  MS. BISHOP:        --40.  40.

12  Q   Exhibit Number 40.  And I'll tell you this

13      is the--I believe pursuant to the notice

14      this is the case list, expert [inaudible]

15      of the last four years as of 2/27/20;

16      correct?

17  A   That--that is correct.

18  Q   And by my unofficial count, you have listed

19      34 different matters in which you've given

20      expert testimony in; is that correct?

21  A   I mean, I--I don't know.  I would trust

22      your count or I--or I can count them myself

23      but--

24  Q   Well, no, it--it's--I think there are 34,

25      but is--is this the--is this the complete

157

1      list?

2   A   Would you go to the very end, please?

3   Q   [inaudible] 2/27/20.

4   A   Right there.  Yes, that is it.

5   Q   Have you ever served as an expert witness

6      for a plaintiff that has brought claims

7      against the correctional facility?

8   A   I have.

9   Q   And are any of those cases on this list?

10  A   They are.

11  Q   And can you tell us which of those cases

12     you were the expert witness for a plaintiff

13     who sued a correctional facility?

14  A   I--I will.  If you would--one thing

15     that--that I need to say is I'm doing this

16     from the best of my recollection, but I

17     will be glad to do that to the best of my

18     recollection.  Are you ready?

19  Q   I am.  Let's just start with page 1 and

20     tell me what--

21  A   In--so we're talking about suit--the page 1

22     has some plaintiff actions but not relating

23     to correctional facilities.  Page 2--

24  Q   Well, on page--let's just talk about where

25     you did then plaintiff and then

158

1          we'll--we'll further clarify that.

2          Where--in what cases did you serve as an

3          expert witness for a plaintiff on page 1?

4    A     In the *Mississippi Board of Nursing* v.

5          *Justin Robbins and Jennifer Rob*--Jennifer

6          *Robbins*.  Well, I don't know if you call

7          that the plaintiff or the respondent, I

8          guess you will say, the person who

9          was--it--it was for--I--I testified on

10         behalf of the nurses, not on behalf of the

11         Mississippi Board of Nursing.

12   Q     Okay.  What else on that page 1?

13   A     The rest--the--none of the rest of those.

14         Go to page 2.

15   Q     All right.

16   A     That--the third one down, *Benoit* v. *Lincoln*

17         *County*, plaintiff.

18   Q     What were the--what opinions did you offer

19         on behalf of the plaintiff in that case?

20   A     I don't recall the specifics.

21   Q     Do you recall anything about that case?

22   A     I do.

23   Q     What was the case about?

24   A     It was a--a case about an inmate who

25         committed suicide in a jail.

159

1   Q    And do you recall whether or not you

2        offered an opinion that it was--the jail

3        was, at least, partly to blame for that

4        suicide?

5   A    I do.

6   Q    Any other opin--opinions you recall you

7        offered in that case?

8   A    I mean, I recall the--the general--I--I

9        recall generally what that case was about.

10       It was about a--a person who--who hoarded

11       antidepressants, a very dangerous

12       antidepressant and took an overdose of them

13       and died.  So that's the general--that's

14       the gist of the opinions.

15  Q    And did you offer an opinion where you

16       partly laid the blame on a jail for that?

17  A    I don't believe partly.

18  Q    Where you laid all of the blame on a jail

19       for that?

20  A    I believe that would be correct.  The jail

21       and/or the--the medical staff that worked

22       there.  I don't recall if they worked for a

23       private vendor or directly for the jail.

24  Q    Did it go to trial?  Did you testify at the

25       trial of that?

160

1    A    Hold on just for a second.  Yes.

2    Q    And was a judgment rendered?

3    A    You're going to--you're going to laugh when

4         I--when I tell you the answer to this.  I

5         think I've been asked it before.  I think a

6         judgment was rendered and I literally don't

7         know the answer.  I never heard back after

8         I gave my testimony, so I don't know the

9         outcome of the case.

10   Q    Okay.  What else on page 2?

11   A    *Clark v. Hamilton County, NaphCare, et al.*

12        on behalf of a plaintiff.

13   Q    Same question.  What opinions did--did you

14        offer opinions against the jail?

15   A    I did.  Well, against the jail and against

16        the medical defendants, as well.

17   Q    And what were the opinions that you offered

18        there?

19   A    That their care was below the standard of

20        care.

21   Q    What were the facts, what were the issues

22        in that case?

23   A    It was an opiate withdrawal, essentially a

24        death due to an opiate withdrawal.

25   Q    All right.  What else?

161

1    A    And--and I'm--I'm going to just caution

2         again to say these are to the best of my

3         recollection.  So I mean, to the extent

4         that I get cases mixed up or--I don't

5         believe I--I'll tell you if I'm unsure but

6         this is to the best of my recollection as I

7         sit here today.

8    Q    [Inaudible].

9    A    *Hays v.--Hays v. Prison Healthcare*,

10        plaintiff.

11   Q    What opinions did you offer in that case?

12   A    Opiate--opiate withdrawal, death due to

13        opiate withdrawal.

14   Q    All right.  What else?

15   A    *Brooks (E/O Mixon) v. Wilkinson County*,

16        same.  And that was also an opiate

17        withdrawal death.

18   Q    And in all of these cases that you've

19        talked about, did you offer opinions that

20        the medical staff did something wrong?

21   A    And/or the correctional officers.

22   Q    Okay.  What else?

23   A    *E/O Gracia v. Orange County*.  That was a

24        case that involved a death in custody, a

25        dog bite that got infected in an HIV

162

```
 1              positive patient.  Plaintiff.  That's all
 2              on that page.
 3     Q    All right.  Page 3?
 4     A    I'm going to look on my page.  I--I--just
 5              let me look at my page instead of yours.
 6              E/O Legros v. Choctaw County, Oklahoma.
 7     Q    What did that case involve?
 8     A    A person with methamphetamine overdose,
 9              delirium due to methamphetamine use and a
10              death.
11     Q    All right.  What others?
12     A    E/O Warner v. Faulkner County, Arkansas.
13     Q    All right.  What was the issue there?
14     A    I--I don't recall specifically.  I--I
15              believe it was--I testified for the
16              plaintiff, and if I'm not mistaken that
17              involved a perforated viscus.  In other
18              words, a person who died of a perforated
19              either bowel or appendix.
20     Q    All right.  Anybody--any--anything else on
21              page 3?
22     A    No.
23     Q    Page 4?
24     A    No.
25     Q    All right.  Let's go back to page 1.
```

163

1   On--did any of the cases that you listed

2   here where you provided expert testimony

3   involve a claim relating to a pregnant

4   inmate?

5   A   If--if you would give me just a moment, I'm

6   going to look at the list to see if it

7   refreshes my memory.  Yes, one--one case.

8   Q   Which one?

9   A   Hold--hold on.  Let me--let me review the

10  list.  I answered prematurely.  I'm sorry.

11  To the best of my recollection, one case.

12  Q   And which one was that?

13  A   It is on page 3.

14  Q   All right.

15  A   *Marziale v. Correct Care Solutions, et al.*

16  Q   And who did you serve as an expert witness

17  for in that case?

18  A   I was retained by an attorney on behalf of

19  Correct Care Solutions.

20  Q   And what were the facts of that case?

21  A   It is a complicated case involving the

22  Arkansas Department of Corrections wherein

23  a person, Ms. Marziale was taken into

24  custody after prolonged methamphetamine use

25  and, approximately--I don't remember

Stephanie A. Blanton, CCR
An/Dor Reporting & Video Technologies, Inc.

164

1    exactly.  I--I'll say a month, but I don't

2    recall if it was three weeks or six weeks.

3    Sometime later she developed pre-term labor

4    and plexia abruption and lost her infant.

5  Q   And what--

6  A   The infant--infant died.

7  Q   And she sued Correct Care Solutions; is

8    that correct?

9  A   I--I--that is an et al, and I believe and

10   also the Arkansas Department of Corrections

11   and multiple other people, as well.  But,

12   yes.

13 Q   And what opinions did you offer in that

14   case?

15 A   That the actions of the correctional

16   officer--I mean, the actions of the nurses

17   and physicians employed by Correct Care

18   Solutions was within the standard of care.

19 Q   Do you know what judgment was entered in

20   that case?

21 A   I do.

22 Q   What--was there one?

23 A   No.  I mean, no, it's an ongoing case.

24 Q   Or it continues--it's ongoing?

25 A   That's correct.

165

1   Q    Have you testified in that--via deposition

2        in that case?

3   A    I have.

4   Q    Do you have a copy of the transcript of

5        that deposition?

6   A    I--ordinarily, the answer to that is--is

7        no.  I don't normally keep depositions.

8        That is an ongoing case, and I would have

9        to check the case file to see whether I was

10       provided a copy of the--I'm--I'm quite sure

11       I filled out an errata sheet.  I don't know

12       whether I have the actual deposition or

13       not.

14  Q    Do you know whether or not an expert report

15       got filed in the public record in that

16       case, your expert report?

17  A    I--I do not know whether it was filed

18       in--in public--I--I--I do know that I

19       prepared a Rule 26 report.  Whether it was

20       filed in the public record as opposed to,

21       you know, distributed amongst the attorneys

22       and under some type of protective order, I

23       do not know the answer to that.

24  Q    Do you still have a copy of that expert

25       report that you prepared in that case?

166

1    A    I do not know at this time.  I would have

2          to check.

3    Q    And that's the only case involving a--a

4          pregnant inmate that's on this list?

5    A    And to the best of my recollection at this

6          time, yes.

7    Q    I note that Southern Health Partners' name

8          appears like at the bottom of page 1, and

9          it's oftentimes difficult when cases are et

10        al.  So on this list can you tell me if you

11        served as an expert witness for Southern

12        Health Partners in any of these matters?

13   A    The short answer is going to be no.  I

14        mean--well, hold on a minute.  Let me--let

15        me look at the--no, I--I cannot tell you

16        one way or the other for certain.

17        Normally, I list cases with the party that

18        has retained me.  So in other words, I

19        cannot say--as a for instance, when a

20        county is listed that usually means I've

21        been retained by the county.  That doesn't

22        mean Southern Health Partners was not a

23        co-defendant but just normally I list it

24        with the--the--the party on whose behalf

25        I've been retained.  So Southern Health

167

1          Partners, the only one I see is that

2          Singleton, and I--to the best of my

3          recollection, that's accurate.

4     Q    If you go to page 4, there's another one.

5     A    Okay.  I'm sorry.  I--I understood you to

6          say that was the only one that listed

7          Southern Health Partners.

8     Q    Well, on--on page 1.

9     A    Okay.  Well, then stop--well, then stop and

10         let me review the whole list and I'll tell

11         you how many times Southern Health

12         Partners' name appears.  Hold on.

13    Q    Here's what I want to know.  Even if it's

14         an et al, I want to know on this list how

15         many times and which of these cases did you

16         serve as an expert witness for Southern

17         Health Partners.

18    A    That's what I'm reviewing now.  The answer

19         appears to be two.

20    Q    All right.  In *Singleton versus Southern*

21         *Health Partners*, what was that case about,

22         at the bottom of page 1?

23    A    I do not recall.

24    Q    Do you recall what opinions you offered on

25         behalf of Southern Health Partners?

168

1   A   I do not.

2   Q   Do you recall how much money you were paid?

3   A   I do not.

4   Q   Let's go over to page 4, *Wadman v. Southern*

5       *Health Partners*.  Do you recall what that

6       case was about?

7   A   Give me just a moment.  I'm very sorry.  I

8       don't.  It doesn't come to my mind.  I--I

9       know that's recent and I--I'm wondering

10      either if I knew it at--I don't know.  The

11      answer is I don't recall.

12  Q   Well, do you know how much Southern Health

13      Partners--or--or do you know how much you

14      were paid as an expert witness in that

15      case?

16  A   I do not.

17  Q   There's--okay.  Do you know how much money

18      you've made over the last four years in

19      testifying as an expert witness?

20  A   I don't have that figure.

21  Q   Well, do you--do you have--do you know if

22      it was more than 100,000?

23  A   I--I can--all right.  So the short answer

24      is--you said over what time period?

25  Q   Well, the time period that you've listed

169

```
 1         these cases.  The last--it was the last
 2         four years but it was--your list is as of
 3         2/27/20.  So--
 4    A    Well, what time frame--what time period are
 5         you asking about?
 6    Q    How much--
 7    A    Are you--
 8    Q    How much money did you earn as an expert
 9         witness in 2019?
10    A    Well, I have not filed my taxes yet, so I
11         don't--I--I don't have an answer to that.
12    Q    Well, you don't have to file your taxes to
13         know how much you've been paid; right?
14    A    Well, I--I have a company, I have a
15         professional corporation that receives fees
16         from expert witness work and from other
17         types of work, and then I am paid as an
18         employee of that corporation.  So obviously
19         the money that I'm paid as an expert
20         witness or that the company is paid does
21         not all go to me.  I have other expenses
22         related to that company.
23    Q    In 2019, how much money was your company
24         paid as a result of your services as an
25         expert witness?
```

170

1   A   As I've said, I haven't filed my taxes.

2       We'd have to check with my accountants on

3       that.

4   Q   Do you know if--do you know if it was

5       greater than 100,000?

6   A   I believe that it was.

7   Q   Was it greater than 200,000?

8   A   I don't know the answer to that.  I would

9       not be surprised if it was in the 2 to

10      $300,000 range.

11  Q   And that's the amount of money in 2019 that

12      you got paid for testifying as an expert in

13      cases similar to this; is that correct?

14  A   No, that's not correct.  That is the amount

15      of revenue that my professional

16      corporation--

17  Q   I--I'm sorry.  Yeah.  The amount of revenue

18      that your corporation received as a result

19      of your work; is that correct?

20  A   That's correct.  That's correct.  It's not

21      the amount of money that I, personally,

22      received.

23  Q   What about 2018?

24  A   What's your question?

25  Q   The same question.  In 2018, how much money

171

```
1        did your corporation get paid as a result
2        of you serving as an expert witness?
3   A    I don't know the answer to that, but I do
4        know that it was less than 2019, and
5        substantially less.
6   Q    Would it still have been greater than
7        $100,000?
8   A    I don't know the answer to that.  I
9        would--I would guesstimate no, but I don't
10       know the answer to that for certain.
11  Q    And it looks like you're being paid $500
12       per hour for review, study and testimony in
13       this case plus travel expenses?
14  A    That's correct.
15  Q    And you have a minimum charge for
16       deposition testimony which is four hours;
17       is that correct?
18  A    That's correct.
19  Q    Well, we just got 20 minutes--
20  MS. BISHOP:      Hey--hey, I'm making this as
21                   an exhibit.
22  MR. HARNICE:     All right.  We'll make this as
23                   Exhibit--
24  MS. BISHOP:      41.
25  MR. HARNICE:     --41.
```

172

By Mr. Harnice:

Q    And ask you if you recognize this document?

A    I do.

Q    And then you have a minimum charge for
     trial testimony is eight hours; is that
     correct?

A    That's correct.

Q    So if--if your testimony at trial is one
     hour, you're going to get paid $4,000;
     correct?

A    Well, so obviously this is on--I have not
     re-thought this fee schedule in the era of
     Zoom; right?  I mean, but normally if I
     were required to travel somewhere, yes, I
     had this and I--I don't know whether it
     will be changed as a result of--of our Zoom
     era we--we might be in and I--I haven't
     thought that through.  But the answer to
     your question is, yes, if I am called at
     trial I would expect to be paid a minimum
     of eight hours for--for that travel and
     that trial testimony.

Q    And that equates to $4,000?

A    That--I think your math is correct.

MR. HARNICE:    That's all the questions I

173

1              have at this time.

2    MS. BRANNON:      Mr. Bentley?

3    MR. BENTLEY:      I have a few.

4                 * * * * * * * * *

5                    EXAMINATION

6    By Mr. Bentley:

7    Q    I've never done the--the screen share

8         thing, Doc, so if we get there and I have

9         to show you something we'll see how it

10        goes; okay?

11   A    Okay.  And I'm--if you just say the

12        document, I may well have it in front of

13        me, as well.

14   Q    It would only be about your opinion, so

15        we'll see if anybody needs--

16   MS. BISHOP:      Aaron, if you're nice to me,

17                    I'll pull it up for you.

18   MR. BENTLEY:     Wow.

19   MS. BISHOP:      We'll see.

20   Q    The only document I--I believe I intend to

21        ask you about is your opinions, so--

22   A    Okay.

23   Q    --it would be easy.  The first one is also

24        an easy question, Doctor.  Are you related

25        to the federal judge, John Thomas Fowlkes,

174

1      Junior?

2   A   I--I am not.  He--I--I am not.  I--I

3      believe that we--is--is he out of the--is

4      he out of Tennessee?  Is that--

5   Q   He is.

6   A   Yes, I--so I have ancestors in the

7      Dyersburg, Tennessee area and I think he

8      might as well, though.  But--so I don't

9      know him roughly--I--we're not related to

10     the best I know.

11  Q   Well, I didn't mean anything.  I just

12     assumed he was your brother or something,

13     so I thought it would be funny.  That was

14     it.

15  A   Yeah.

16  Q   Okay.  Sorry.

17  A   That's okay.

18  Q   Do you agree with me that--that Kelsey Love

19     was suffering from addiction?

20  A   I--I agree that she had a significant

21     substance use disorder.  So the--the reason

22     I'm hesitating in--in my answer is that

23     addiction can just mean a substance use

24     disorder, which, yes, I agree; or was she

25     addicted which is equivalent to being

175

1      physically dependent upon substances.  And

2      I don't know if at the time of her arrest

3      she was using substances consistently

4      enough and in high enough quantities to be

5      physically dependent upon opiates.  I did

6      not see that she had a significant opiate

7      withdrawal syndrome.  And the same would be

8      true for methamphetamine.  So I'm sorry for

9      that long answer, but I--

10   Q   That's fine.  But you agree that she was

11      suffering from substance use disorder?

12   A   Absolutely.

13   Q   Specifically, opioid use disorder?

14   A   Her--if I were listing it in order of

15      priority, I would say methamphetamine

16      first, but, yes, she was use--she abused

17      both methamphetamines and opiates.

18   Q   Is substance use disorder a lifelong

19      illness?

20   A   It is a lifelong illness and diagnosis.  It

21      can have--it is characterized by relapses

22      and remissions, but, yes, it is a lifelong

23      disorder.

24   Q   Would you agree with me that it's similar

25      to other chronic illnesses like

176

1        hypertension, asthma and diabetes?

2    A    I would.

3    Q    Okay.  And by that I mean, would you agree

4         that sometimes people can manage substance

5         use disorder but other times it gets out of

6         control?

7    A    That's right.  Relapses, remissions,

8         needing treatment, compliance issues

9         with--with medications and treatment with

10        both that and other things.  So its--its

11        relapse and remission rate and compliance

12        rate are similar to other chronic

13        conditions; yes.

14   Q    You might have began to guess what my next

15        question was going to be, so I appreciate

16        that, Doctor.  And substance use disorder

17        is recognized by the DSM-V; correct?

18   A    That's correct.

19   Q    I believe this is correct.  You're a member

20        of the American Society of Addiction

21        Medicine?

22   A    That's correct.

23   Q    Are there practice guidelines generally

24        accepted in the addiction medicine field?

25   A    Well, yes.  I--your ASAM place--what is

1        called ASAM placement criteria that--that

2        guide what type of treatment is--is

3        appropriate.  And, yes, that is standard in

4        the industry.  I will say, however,

5        obviously, that is not exactly germane to a

6        county jail in that when--when inmates are

7        detained sometimes we don't get to choose

8        the level of care, that the courts choose

9        it for us.

10   Q    What do you mean by that?

11   A    Well, for--what I mean is that someone who

12        is--as--and this is again as an example,

13        not directly related to this case.  But if

14        a person is incarcerated or detained in a

15        county detention facility and has a severe

16        substance use disorder, the ASAM placement

17        criteria might say that they're appropriate

18        for inpatient residential treatment.  But

19        if they are facing a serious felony charge

20        and the judge won't give them bond, they

21        can't make bond, so I'm forced to treat

22        their substance use disorder and detox them

23        in my jail.  I can't just send them to a--a

24        residential treatment facility just because

25        ASAM placement criteria says that's an

178

1          appropriate placement.

2    Q     Okay.  I understand.  Thank you.  You--you

3          said that at the detention center where you

4          are employed the medical staff is not there

5          24 hours a day; correct?

6    A     That is correct.

7    Q     In those times when the medical staff is

8          not present, is it fair to say that you

9          rely on the correctional staff to alert you

10         if there is a medical issue?

11   A     That is correct.  Well, not just me but the

12         nurses on-call are to take action based

13         upon that, but yes.

14   Q     You expect them to be the ones to either

15         alert some medical personnel or to have the

16         person sent to the emergency room; correct?

17   A     That's correct.

18   Q     And there may be some of these questions

19         about your opinion that we can reference

20         without you having to look at them.  You

21         tell me if you want to see it.

22   A     Okay.

23   MR. HARNICE:      We--we were on mute.  Sorry

24                     about that.  Objection to

25                     form.  Go ahead.

179

1   Q    You note in your opinion that Ms. Love had

2        abused drugs during prior pregnancies.  Do

3        you recall saying that?

4   A    I do.

5   Q    Do you know if each of her prior births or

6        deliveries occurred in a hospital?

7   A    I--I don't know for certain.  I--I--to the

8        best of my recollection, they did all occur

9        in a hospital, but I can't say that to a

10       reasonable degree of medical certainty.

11  Q    Did you--you reviewed the documents from

12       the--the jail or the jail medical staff.

13       Did you accept as true the information

14       contained in those documents?

15  A    Well, I--I--I always accept as true the

16       documents as they are presented to me.

17       That does not mean that there are not

18       sometimes conflicting information in the

19       chart.  I don't make a determination about,

20       for instance, the truth of--of what people

21       are saying.  I look at the documents as

22       they are written and I presume them to be

23       true.  But sometimes there are conflicts

24       even within the documents.

25  Q    Okay.  I want to--I want to look at

180

```
 1        specific ones.
 2   MR. BENTLEY:       Sarah, do you want to pull it
 3                      up?  I'm happy to.
 4   MS. BISHOP:        I'll be happy--no, I'll be
 5                      happy to.
 6   MR. BENTLEY:       Okay.  I can try--I'll need to
 7                      figure out--
 8   MS. BISHOP:        You want--want the report?
 9   MR. BENTLEY:       Yes, please.  Page 5 of his
10                      report.
11   MS. BISHOP:        Okay.
12   THE WITNESS:       I'm going to try to--I'm just
13                      going to make a comment if you
14                      don't--I'm going to try to
15                      turn to the actual page within
16                      the case file itself.  But
17                      anyway, pull it up and I'll--
18   MR. BENTLEY:       If--if everybody has a copy, I
19                      don't care, but it's up to--if
20                      anyone wants it to be up on
21                      the screen.  Can you go to the
22                      bottom of that page?  I don't
23                      like doing this.  I really
24                      don't like asking you to do
25                      this.
```

181

1   MS. BISHOP:        I don't mind.

2   MR. HARNICE:       Come on, Aaron, you were the

3                      one that said we needed to do

4                      the depositions this way.

5   MR. BENTLEY:       It makes me very

6                      uncomfortable.  Okay.  Thank

7                      you.

8   Q    In letter G there, Doctor, you've written,

9        the CO answered no, to, is the inmate in

10       need of immediate emergency medical

11       attention?  Did I read that correctly?

12  A    You did.

13  Q    And so my question is:  Did you credit this

14       information as meaning Ms. Love did not

15       need im--immediate emergency medical

16       attention at that time?

17  A    Well, I just think--I just think the

18       obvious, but, no, what I credited was that

19       the CO answered no to that question.  I

20       mean, I'm--I'm not trying to be difficult,

21       but--

22  Q    No.  That's exactly what I'm asking.

23       Did--I'm trying to find out whether based

24       on that you formed the belief that Ms. Love

25       did not need immediate emergency medical

182

1    attention at the time the form was filled

2    out.

3  A   I--I formed the opinion that the

4    correctional officer came to that

5    conclusion.

6  Q   Okay.  And I'm also not trying to be

7    difficult, but does that mean you did not

8    form the opinion from that statement that

9    she didn't need immediate medical emergency

10   attention at that time?

11 A   I--I did not see anything within the

12   record, not specifically that question,

13   which indicated that she did, if you--if

14   you follow my--I'm not sure if that's an

15   answer to your question.  But I didn't see

16   anything in the record indicating that she

17   did require immediate medical attention at

18   that time.

19 Q   You did not simply read this answer of no

20   and decide from that on its own that she

21   did not need immediate emergency medical

22   attention?

23 A   That's correct.

24 Q   Okay.  Do you recall reviewing the

25   observation records?

183

1  A    I do.

2  Q    Did you review any surveillance footage in

3       this case?

4  A    No.  Only the--the--the only video that I

5       reviewed was the one body cam.  I--I don't

6       know if you'll call that surveillance.

7       I--I wouldn't call that surveillance; I

8       would call it body cam video, but the one

9       body cam clip.

10 Q    Did you credit the observation records as

11      being true?

12 A    I accepted them as face value.  In other

13      words, I didn't--I didn't presume that they

14      were not true.  Yes, I did--not having any

15      reason to believe they were not recorded

16      accurately reflect what--what went on.

17 Q    But you didn't, for example, compare the

18      observation records to surveillance footage

19      from the area outside of Ms. Love's cell;

20      correct?

21 A    I did not in this case.  That's correct.

22 Q    So you don't have--you can't be positive

23      that the times recorded in the observation

24      logs are correct; right?

25 A    Well--well, that's--that might be stating

184

1          the obvious, but to the extent there is

2          actual surveillance video that can prove

3          those times, no, you are exactly correct.

4          I--I did not compare them and so don't have

5          a basis to say that, yes, they are a

6          hundred percent correct.

7     Q    And you also can't know what was happening

8          in the cell when the officers made their

9          records; correct?

10    A    I can't--I cannot based upon the

11         information that I have which doesn't mean

12         that I could not if I had a--video

13         surveillance from within the cell, but I

14         did not have that.

15    Q    For example, if an observation record says

16         she was sitting, you have no way of

17         confirming whether Ms. Love was sitting at

18         that time; correct?

19    A    Yes.  But the converse is true, I have no

20         way--or no reason to suspect that was not

21         her--her position at that time ab--absent

22         looking at some kind of surveillance video.

23    Q    You spoke with--with Mr. Harnice about your

24         involvements with--with pregnancies or--or

25         deliveries, more--more deliveries really.

185

1       Do you have any experience with managing

2       pregnant patients throughout their

3       pregnancy?

4  A    Unfortunately, yes.  I say unfortunately, I

5       mean, we--we--we have pregnant detainees

6       that we take care of in the jail, and, yes,

7       that's a pretty common occurrence in--in

8       most any county detention center.

9  Q    And is the detention center a--a pre-trial

10      detainee facility?

11  A    Well, it's a county jail, and its primary

12      function is a detention--is the detention

13      of pre-trial detainees.  The reason I'm

14      hesitating is that we also have federal

15      pre-trial detainees and after they are

16      sentenced it can take up to a year or so

17      for them to be moved on to the Bureau of

18      Prisons.  So some of my detainee--some of

19      my inmates are pre-trial detainees, some

20      are sentenced.  We obviously keep some who

21      are serving a post conviction sentence

22      locally.

23  Q    And again, if somebody wants this pulled

24      up, it's fine; otherwise, I don't care.

25      Page 21 of your opinion, Doctor.

186

1  A    Just let me turn to it.

2  Q    Sure.

3  A    I'm there.

4  Q    You say--well, let me turn to it so that I

5       can see where it is on the page rather than

6       referring to my notes.  Oh, great news.

7       It's in the very first line.  You say, the

8       security staff could not get Ms. Love to

9       articulate clearly what her problem was.

10      Did I read that correctly?

11 A    That is correct.

12 Q    Now--and actually, let me go back to page

13      20 real quick and just--let's look at this

14      entire paragraph number 6.  You write, I

15      did not find any evidence in the records I

16      reviewed of Ms. Love complaining of any

17      symptoms which could reasonably

18      be--reasonably be related to labor until

19      4:35 a.m. on the morning of 5/16/2017.  At

20      this time Ms. Love was screaming.  Security

21      staff could not get Ms. Love to articulate

22      clearly what her problem was.  Did I read

23      that correctly?

24 A    That's correct.

25 Q    Now, is it fair to say they--well, let me

187

1   ask it this way:  Is there any evidence

2   that you saw that a security staff member

3   talked to Ms. Love before 5:15 a.m. in this

4   time period you're talking about, between

5   4:35 and 5:15?

6   A   I--I saw--I saw the observation logs which

7       were--you know, contained some entries, and

8       I know they knew that she was screaming.

9       There was some--the reason I'm being a bit

10      hesitant is there was some conversation

11      about--I say conversation, something in the

12      records about a male officer talking to her

13      through a door and then went and got the

14      female officer.  So to--to the extent

15      that--I can't tell you anything about the

16      details of that or even specifically where

17      I got it, but I--I believe there was some

18      conversation about a male officer trying to

19      determine what was going on, then he went

20      and got a female who opened the door.

21  Q   When you say the security staff could not

22      get Ms. Love to articulate clearly what her

23      problem was, when are you talking about?

24  A   Around the 5:15 time frame.

25  Q   And you have told me that you--

188

1   A   By--by the way, I mean, not only then but

2       she had been that way the day before, as

3       well.  I mean, she was giving inconsistent

4       answers.  But certainly at that time, 5:15.

5   Q   My question is:  This specific sentence in

6       your report, is it pertaining to the 5:15

7       interaction?

8   A   That's correct.

9   Q   The 5:15 a.m. on May 16th interaction?

10  A   That's correct.

11  Q   Now, you indicated that you've watched the

12      body cam video from this interaction;

13      correct?

14  A   That's correct.

15  Q   Did you hear on the video Ms. Love say that

16      she felt she was having contractions?

17  A   Much of what--much of what Ms. Love said I

18      could not clearly distinguish what she was

19      saying.  So I--I'm--I'm not prepared to

20      give an answer about what her exact

21      statements were.  I couldn't understand it

22      all clearly.

23  Q   You could not hear her say she was having

24      contractions?

25  A   I don't recall specifically whether I--I

Stephanie A. Blanton, CCR
An/Dor Reporting & Video Technologies, Inc.

189

1      think that--I think the question was

2      that--so I did not hear her say--say the

3      word contractions.  I believe she was

4      something like asked was she having

5      contractions.  That's what I was referring

6      to.  I do not recall her saying the words,

7      I'm having contractions; no.

8   Q  Do you recall her answering that question

9      yes?

10  A  That's to what I refer that I--if you want

11     to play it, I'll tell you--if I can

12     understand it I can tell you.  Some of her

13     answers I could--could understand, some of

14     them I could not.  I don't recall the

15     answer to that specific one at this time

16     without looking at the video.

17  Q  That's probably way beyond my technological

18     abilities, Doctor, so I'm not going to

19     spend the time doing that.  Do you--do you

20     recall on the video hearing Ms. Love say

21     her baby was coming out?

22  A  I--I recall her saying something about, get

23     it out, or--or something to that effect.

24     I--I don't recall exactly--again, I--I

25     couldn't hear clearly enough that I would

190

1       tell you that that was a--you know, if--I

2       couldn't transcribe the information there.

3   Q   Well, after you watched the video, did you

4       believe she was unable to articulate

5       clearly what her problem was?

6   A   [Inaudible].

7   MS. BRANNON:       I think he just froze.  Yeah,

8                      he just froze.  So--so it's

9                      not just that Zoom hates Paul,

10                     Zoom hates Aaron too.

11  MR. HARNICE:       I hate Zoom back.

12  MR. BENTLEY:       Presumably he will get kicked

13                     out and come back.

14  MS. BRANNON:       And you will have to unlock so

15                     he can get in, I guess?

16  VIDEO TECHNICIAN: I already did that.

17  MS. BRANNON:       Okay.

18      (OFF THE RECORD)

19      (A BRIEF BREAK IS TAKEN)

20  VIDEO TECHNICIAN: And we're back on the record

21                     at 5:31.

22  By Mr. Bentley:

23  Q   My last question, Doctor, and we didn't get

24      to hear any of your answer, was:  After

25      watching the video, were you able to

191

1        understand clearly what Ms. Love's problem

2        was?

3    A   Well, I will preface my answer with saying,

4        you know, I'm a physician, I'm not a

5        correctional officer, so I--I have a

6        different perspective of what her symptoms

7        might have been.  But I understand that she

8        was--she was complaining and the officers

9        couldn't understand everything she was

10       saying.  I couldn't understand everything

11       she was saying, either.  But--so my point

12       is that I'm looking at it as a physician

13       and in hindsight as opposed to a

14       correctional officer at that time.

15   Q   Were you able to understand what her

16       problem was?

17   A   In hindsight, I believe I know what her

18       problem was; yes.

19   Q   What do you believe her problem was?

20   A   That she was having abdominal pain which

21       was likely labor.

22   Q   Have--if you're on-call and you were told

23       by a correctional officer that a pregnant

24       patient claimed they were having

25       contractions and--what--what would your

192

1          response have been to that?

2     A    All right.  So I'm going to clarify my--my

3          differences with what's going on here.  So

4          you're talking about me being on-call as a

5          physician as opposed to a nurse, that's

6          number one.  And with the--the--the person

7          who's calling me telling me that the--the

8          pregnant person, who--you--you haven't made

9          the hypothetical how far along they are,

10         but--but that they're having contractions;

11         that's correct?

12    Q    That is correct.

13    A    Okay.  Given that they were late in

14         pregnancy and they were having contractions

15         I would tell them to send them to the

16         hospital.

17    Q    But in that instance where you're not

18         present, you can't know if the inmate said

19         she's having contractions unless the

20         officer tells you; correct?

21    A    Well, the officer's giving you some

22         information and you're asking questions

23         based upon that and then you're making a

24         determination based on your best

25         inter--your best interpretation of the

193

1        interaction with the officer or with

2        whoever's speaking to you about what's

3        going on, about are they having

4        contractions, are they having other signs

5        of labor.  And--and that's what happened

6        here and the--there was not a--there was

7        not a communication of information which a

8        reasonable person would conclude was labor

9        in this case.

10   Q   My question--well, let's--based on your

11       review of the documents, is there any

12       indication that Ms. Upton notified Nurse

13       Sherrow that Ms. Love said she was having

14       contractions?

15   A   To the best of my--my review of the case,

16       that did not occur?

17   Q   And you as a medical professional can't

18       react to information that you're not given;

19       right?

20   A   That is correct.

21   MR. HARNICE:       Objection to the form;

22                      foundation.

23   Q   All right.  Will you turn, Doctor, to page

24       22 of your opinion?

25   A   I'm there.

                                                                194

1    Q    Down toward the bottom under Roman Numeral

2         II and Number 1.

3    A    Okay.

4    Q    You write, her behavior and actions placed

5         her and her unborn child at significant

6         risk whether she was incarcerated at FCRJ

7         or not.  Did I read that correctly?

8    A    You did.

9    Q    Is it your understanding that the Franklin

10        County Jail admitted Ms. Love?

11   A    Ask your question again.

12   Q    Is it your understanding that the Franklin

13        County Jail admitted Ms. Love as an inmate?

14   A    Well, I--I don't use the term admit.  I

15        mean, Franklin County Jail is not a health

16        care facility, so they did not admit her.

17        This is a detention facility and they

18        accepted her for detention; yes.  I mean,

19        those are--I'm sorry for quibbling on the

20        terminology but--

21   Q    You agree she was incarcerated at the

22        Franklin County Regional Jail; correct?

23   A    I--I do.

24   Q    Based on your experience as a correctional

25        health care practitioner, do you believe

195

1          the Franklin County Regional Jail became

2          responsible for her care upon incarcerating

3          her?

4     A    Well, that's primarily a legal question,

5          but as a practical matter, yes, when one is

6          at a jail the--the jail facility is

7          responsible for providing you access to

8          care; yes.

9     MR. HARNICE:       Objection to form and

10                       foundation on that question.

11    Q    In your practice, do you refuse patients or

12         inmates care because of their substance

13         abuse issues?

14    A    Not because of their substance abuse

15         issues; no.

16    Q    Ms. Love deserved medical care whether she

17         was suffering from substance use disorder

18         or not; correct?

19    MR. HARNICE:       Object to the form and

20                       foundation.

21    A    Would you repeat the question, please?

22    Q    Yes.  Ms. Love deserved medical care in the

23         Franklin County Regional Jail if necessary

24         regardless of whether she suffered from

25         substance use disorder; correct?

196

1   MR. HARNICE:        Same objection.

2   A    That--that would not impact--that would not

3        impact her--her ability to get medical

4        care; yes--it should not.  Yes, that's

5        correct.

6   Q    Going on down page 22 under Number 2 you

7        write, Ms. Love was better off to have been

8        incarcerated and prevented from using more

9        drugs in the days prior to her delivery

10       than had she been out and continuing her

11       active substance abuse.  Did I read that

12       correctly?

13  A    You did.

14  Q    On what do you base that opinion?

15  A    On treating lots of pregnant addicts.  I

16       mean, she didn't need to keep using meth.

17       It wasn't good for her and it would have

18       potentially deleterious effects.  And

19       presuming that she didn't use more

20       methamphetamine after she was arrested and

21       at the Franklin County Jail, which I see no

22       evidence that she did, she would be better

23       off not using meth than using meth.

24  Q    Is there any evidence that Ms. Love's meth

25       use affected the baby?

197

1    A    Well, the short answer to that is--I didn't

2         see any evidence of that.  I have very

3         little information about the baby other

4         than it appeared to be born healthy and was

5         discharged.  But I don't have any other

6         information about the baby.

7    Q    Let's move over to page 23.

8    A    I--I'll just--I'll just stop and say, to

9         the extent that--I--I'm sorry.  I'll just

10        add that to the extent that it might have

11        hastened labor or any such thing, I'm not

12        prepared to give that opinion and I don't

13        have an opinion about that.  It--I'm not

14        going to say someone might not have an

15        opinion about it, but I don't.

16   Q    Okay.  Moving on to page 23, top of the

17        page, you write, although not ideal to

18        deliver a baby in a jail cell--jail cell,

19        this was not reasonably foreseeable or

20        presentable--or preventable, rather, given

21        Ms. Love's severe psychiatric symptoms and

22        bizarre behavior in the days prior to her

23        delivery.  With the corrections I made in

24        there, did I read that correctly?

25   A    Yes, that's correct.

198

```
 1   Q    I--I just--I, frankly, don't understand the
 2        sentence, I'm going to ask you to explain
 3        it to me.  And how--the part that comes
 4        after given, how does that explain the
 5        first part of the sentence?  And by that, I
 6        mean, what do her psychiatric symptoms and
 7        bizarre behavior, as you've termed it, have
 8        to do with whether her delivery was
 9        foreseeable or preventable?
10   A    Well, as a for instance, she had been
11        screaming, and I'm using that term sort of
12        loosely.  I don't know to what extent it
13        was actually screaming.  She had been loud,
14        she had been uncooperative, non-compliant
15        on the morning before so much so that they
16        had--had to put her in a restraint chair
17        and spray her with pepper spray, and she
18        was giving inaccurate information.  So
19        that's a different scenario than if someone
20        had said, I'm here at the jail, I--I am at
21        36 weeks and 4 days pregnant, and I may go
22        into labor at any time and I will let you
23        know if I start having symptoms I think is
24        labor.  That's a different scenario than
25        this one where Ms. Love was non-compliant,
```

199

1       wasn't giving accurate information, had

2       been screaming, had required restraint so

3       it made it more difficult to interpret what

4       was going on with her.

5    Q  Is it your understanding from your review

6       of the records that Ms. Love told the jail

7       staff she was eight months pregnant?

8    A  It is my understanding from the view--a

9       review of the records that she first told

10      the arresting officer she wasn't pregnant,

11      she told the--the booking officer that she

12      was pregnant, the next morning she said she

13      wasn't pregnant.  But by the time the

14      receiving screening was completed on the

15      morning of the 15th, they had made some

16      determination about how pregnant she was

17      and eight months is a re--I--I don't

18      remember the specifics, but, yes, they knew

19      that she was pretty far pregnant with

20      pretty good bit of certainty by Monday

21      morning.

22   Q  Is it not foreseeable that a pregnant

23      person who is eight months pregnant could

24      be close to delivering their baby?

25   A  Well, that's a relative term.  But, yes,

200

```
 1              within the next month or so it was

 2              reasonable to expect that she would deliver

 3              a baby.

 4    Q    And--and I--I appreciate we disagree or we

 5         may disagree about whether she said she was

 6         having contractions, but if you assume that

 7         she told Ms. Upton she was having

 8         contractions, wasn't it foreseeable that

 9         a--an eight months pregnant person having

10         contractions was going to deliver a baby

11         relatively soon?

12    MR. HARNICE:      Objection to the form and

13                      foundation.

14    A    Well, to the extent that she said that and

15         to the extent that the correctional

16         officers relayed that to the nurse, that

17         would--I didn't see evidence of that that

18         Nurse Sherrow had any information about her

19         having contractions.  And in fact, she made

20         inquiry about--about symptoms that would be

21         referable to labor.  And so I didn't see

22         where that was communicated--certainly not

23         communicated to Nurse Sherrow.

24    Q    If Ms. Love said she was having

25         contractions to Ms. Upton, was it not
```

201

1           foreseeable to her that the baby could be

2           delivered soon?

3    MR. HARNICE:        Objection to form and

4                        foundation.

5    A    I wasn't retained in this case to provide

6         opinions regarding the actions of the

7         correctional officers, and I did not look

8         at it in that level of detail to be able to

9         provide an opinion about that.

10   Q    Are you saying in your report you didn't

11        provide any opinions about the--the

12        correctional officers' behaviors or

13        obligations?

14   A    Well, I was retained on behalf of the

15        medical defendants and Southern Health

16        Partners.  I was not retained on behalf of

17        the correctional officers.  And so it was

18        not my opinion in--it is not--was not my

19        intention in this case to provide those

20        opinions.  That was not what I was retained

21        for and I did not look at the records from

22        that standpoint.

23   Q    Do you--I understand from your prior

24        testimony you expect that the correctional

25        officers at the jail that you work in are

202

```
 1              trained to recognize symptoms of labor;

 2              correct?

 3     A    They're trained--they're trained to

 4              recognize medical emergencies of all kinds.

 5              Labor would be one of those things.  I--I

 6              hesitate to say that that's almost more

 7              even a layperson determination than a--than

 8              a medical officer.  So in other words, I

 9              would expect that reasonable people on the

10              street could determine when a person may be

11              having labor.  That's not really a--a

12              medical thing, I mean.  But, yes, I do

13              expect correctional officers to have an

14              understanding of the presentation of

15              medical emergencies and what action to take

16              based on that.

17     Q    And would you expect that a correctional

18              officer working with you at the jail, at

19              the detention center who was told by an

20              inmate that she was having contractions,

21              would you expect that correctional officer

22              to report that to medical personnel?

23     A    I would.

24     MR. HARNICE:      I'm sorry.  We were on mute.

25                       Let me object to form and
```

203

1                        foundation on that.

2   Q    Would you expect the off--the--the

3        hypothetical officer we were just talking

4        about to appreciate contractions as a

5        symptom of labor?

6   MR. HARNICE:        Objection to the form and

7                       foundation.

8   A    As--as you're phrasing it--so in other

9        words, if they appreciate that, yes.  Now,

10       obviously in this case it's a bit more

11       complicated because there was screaming and

12       she--there was behavior the day before that

13       had been apparently not related to labor

14       but had been related to other drug use.  So

15       this is a more complicated situation.  But,

16       yes, if they appreciated contractions I

17       would expect them to recognize that as

18       labor or possible labor.

19  Q    We can't--I mean, if I'm not mistaken, you

20       can't determine whether a pregnant person

21       is in labor without checking their cervix;

22       correct?

23  A    I--I'm not trying to quibble.  I think

24       technically you can.  You can put them on

25       the--a--monitoring.  But I--I'm not trying

204

1        to quibble.  It would require a medical

2        professional.

3    Q   That's--that's the only point I'm making

4        is--

5    A   That--that's--I agree with you.

6    Q   A medical professional would need to

7        examine her to determine if she was

8        actually in labor; right?

9    A   That's correct.

10   Q   Okay.  Turning--or we're still on page 23,

11       we're in the same paragraph, you write,

12       this setting was preferable to her having

13       been at large under the influence of

14       methamphetamine and with her psychiatric,

15       excuse me, illness completely unattended.

16       Did I read that correctly?

17   A   You did.

18   Q   On what did you base that opinion?

19   A   Well, I hate to say common sense.  I'm not

20       trying to--I'm--I'm not trying to be smart.

21       But it makes--it--it's intuitive to me that

22       had she been in the--I'm using an entirely

23       made up example.  Had she been in the

24       Wal-mart parking lot with--you know, by

25       herself--my--my point is that she was, you

205

1      know, completely unattended with nobody

2      there to--continuing to use drugs, by

3      herself, that would not be an ideal

4      situation to deliver a baby, either, a

5      less--it would be a less ideal situation.

6   Q  Of course, if she were not incarcerated,

7      she could go to the hospital; correct?

8   A  She could have.  I mean, she could have

9      gone to the hospital if she was

10     incarcerated--incarcerated as well.

11  Q  Well, she couldn't get up and walk out and

12     go to the hospital; right?

13  A  That's correct.

14  Q  What--what I meant by my earlier question,

15     and I'll clarify, is if she were not

16     incarcerated she could of her own free will

17     go into a hospital to obtain medical help

18     for her labor and delivery; correct?

19  MR. HARNICE:      Objection to form and

20                    foundation.

21  A  She could have, but I will point out she

22     could as easily have just continued using

23     drugs and had the baby, you know, in a--any

24     other kind of environment as well.

25  Q  Well, and--and that's why I asked you

206

1    earlier, Doctor, do you--do you have

2    evidence that with any of her prior

3    pregnancies she delivered outside of a

4    hospital?

5  A  I--I do not, but I do have evidence that

6    maybe--I want to say two weeks before--I'm

7    not sure exactly the time frame--she went

8    to the hospital back in Indiana and said

9    she thought she was having labor but she

10   wouldn't let the nurses check her and she

11   got up and walked out.  So I have evidence

12   that she was not compliant and even when

13   she thought she was in labor she got up and

14   left from the hospital.  So I don't think

15   you can make the leap that she would have

16   necessarily gone to a hospital.

17 Q  And I'll just--I'll repeat my question one

18   more time.  Is there any evidence that she

19   ever delivered a baby outside of the

20   hospital setting before this baby?

21 A  Not that I'm aware of.

22 Q  Would it have been preferable that she

23   deliver this baby at a hospital?

24 A  Well, I think the common sense answer is

25   yes, although I did not see any

207

1        complications that occurred as a result of

2        her delivering it out--the baby out of

3        hospital.

4   Q    Continuing on page 23 you write, her,

5        meaning Ms. Love's--problems all stem from

6        her untreated substance abuse and

7        psychiatric illness rather than her

8        delivery.  Did I read that correctly?

9   A    You did.

10  Q    To what problems are you referring?

11  A    So to the--she was--she remained bizarre in

12       the hospital, she remained with significant

13       psychiatric symptoms.  I--I'm not certain

14       that she wa--I--I didn't have the complete

15       records.  I'm not certain she left AMA as

16       opposed to being discharged.  But she was

17       having significant problems after her

18       delivery but they were not postpartum

19       complications but they were related to her

20       ongoing substance use and/or psychiatric

21       disorder.  So she did not have perinatal

22       complications.

23  Q    Is that what your opinion is restricted to,

24       perinatal complications?

25  A    Well, this--this Number 4 is--despite the

208

1    setting, Ms. Love having essentially

2    completely unremarkable delivery, she did

3    not have any significant peripartum

4    complications, and she had an uneventful

5    recovery.  So, yes, the--the problem she

6    was having around the time of her delivery

7    and around--and after that were related to

8    her substance use and her psychiatric

9    history.  She did not have any identifiable

10   complications as a result of the birth at

11   the jail.

12   Q   And what I'm trying to make sure, Doctor,

13       is, are you opining regarding any

14       subsequent mental or emotional damage that

15       she could have suffered as a result of this

16       incident?

17   A   I do not have any future medical re--or

18       medical records after the time of this, and

19       I don't have an opinion about that.  To--to

20       the extent that I'm provided any additional

21       records of later events, I would be glad to

22       review them, but I don't have them at this

23       time.

24   Q   You--you've stated during Mr. Harnice's

25       questions--I'm sorry.  You--you've talked

209

1          about the point in your opinion where you

2          say you strongly agree with one of

3          Mr. Sweeney's opinions.  Do you recall that

4          testimony?

5     A    I do.

6     Q    And the--the part of Mr. Sweeney's

7          testimony was that there is no evidence

8          that any of the defendants knew or should

9          have known that Love was about to deliver

10         her baby in her cell.  And was that the

11         part of his opinion that you--with which

12         you strongly agree?

13    A    I hate to belabor the point, but let me

14         turn to that--I recall it being paragraph

15         68, and let me just--

16    Q    Page 14, paragraph 68.

17    A    Yes.  If you don't mind--if you'll just

18         bear with me and let me turn to that

19         actually, I would appreciate it.

20    Q    No problem.

21    A    Well--and again, I'm--I hate to not answer

22         your question directly but I agree with

23         that paragraph when I read it before.  I--I

24         would be glad to read it again, but I agree

25         with that paragraph and the--the words that

210

1        are contained therein.

2   Q    You wrote your report before you watched

3        the body cam video; is that right?

4   A    To the best of my knowledge, that is

5        correct.

6   Q    And--and this is where I have a concern

7        about you telling me earlier you're not

8        giving any opinions about the jail staff

9        because any of the defendants includes the

10       jail staff here; doesn't it?

11  A    I--I'll agree that it does.  And--and--I

12       will agree that it does and my opinion in

13       that regard should have been clarified to

14       say at least as it applies to Nurse

15       Sherrow.

16  Q    So then are--are you not opin--opining that

17       the jail staff--I'm sorry--that there's no

18       evidence that the jail staff knew or should

19       have known that Love was about to deliver

20       her baby in her cell?

21  MR. HARNICE:        Objection to form and

22                      foundation.

23  A    Well, I was not retained for that purpose

24       and I didn't review the records of--from

25       that standpoint, and so I neither have nor

211

1       plan to offer opinions about that.

2   Q   Have you ever had your testimony excluded

3       in full as an expert?

4   A   Excluded in full.  I--I believe the answer

5       to that would be no.  I--I'm not exactly

6       sure what you're--but--I believe the answer

7       is no.

8   Q   That's fine.  I can clarify it.  Have you

9       ever been asked to testify or retained to

10      testify in a case and a judge ruled that

11      you could not testify?

12  A   Not in--not certainly as it relates to

13      correctional health care.

14  Q   Does that mean in a non-correctional health

15      care case your testimony was excluded in

16      full?

17  A   Well, I don't know about in full.

18      There--one of these cases on this case list

19      is a criminal matter in which there was

20      a--an indigent defendant.  I--he was

21      charged with murder for leaving his baby in

22      a--in a car.  And I treated him after that

23      event and was prepared to testify on a pro

24      bono basis that he did not intend to leave

25      the baby in the car.  And a judge in the

212

1        pre-trial hearing ruled that I was--number

2        one, I was not an expert in forgotten baby

3        syndrome, and number two, what he told me

4        after the fact wasn't relevant to his state

5        of mind, and, therefore, I wasn't allowed

6        to testify at trial.

7    Q   Have you ever had parts of your testimony

8        excluded in a correctional health care

9        case?

10   A   No--not to the best of my knowledge.

11   Q   Are you familiar with the case of *Shaun*

12       *David Brooks versus Wilkinson County,*

13       *Georgia*?

14   A   Yeah, I am.

15   Q   Do you recall parts of your testimony being

16       excluded in that case?

17   A   I do not.

18   Q   Did you offer an opinion in that case that

19       a defendant did not perform a medical

20       screening correctly because video of the

21       screening showed that the defendant filled

22       out the form too quickly to leave time for

23       adequate questioning of the inmate?

24   A   I do.

25   Q   Do you recall whether that testimony was

213

1        excluded?

2    A    That--no, I--I do not know that.  I--I

3         understand what you're talking about.  I

4         don't know anything about it, that

5         testimony being excluded.

6    Q    Do you know what the status of that case

7         is?

8    A    To the best of my recollection or

9         understanding, that case is settled and

10        it's closed.

11   MR. BENTLEY:      Okay.  Those are all my

12                     questions.  Thank you, Doctor.

13   MS. BRANNON:      Paul, do you have anything

14                     else?

15   MR. HARNICE:      Give me--give me five seconds

16                     here.

17   MS. BRANNON:      One Mississippi.

18   THE WITNESS:      While--while we're still on

19                     the record, and I'm not sure

20                     if it might not be a--a rule

21                     in Kentucky or something, but

22                     what about my ability to read

23                     and sign the deposition?

24   MS. BRANNON:      It--would you like to read and

25                     sign your deposition?

214

1    THE WITNESS:        I would.

2    MS. BRANNON:        Okay.  We can do it.  Most

3                        people don't want to.

4    MR. HARNICE:        I have no questions.

5    MS. BRANNON:        All right.  I think that you

6                        are free to go, Doctor.  Thank

7                        you very much.

8    THE WITNESS:        Thank you-all.  We'll see you.

9    MS. BRANNON:        See you.

10   VIDEO TECHNICIAN: The time is 5:57.  We'll go

11                       off the video record.

12                  *  *  *  *  *  *  *  *  *  *

13       THEREUPON, the video deposition of

14   DR. THOMAS D. FOWLKES was concluded at 5:57 p.m.

15                  *  *  *  *  *  *  *  *  *  *

16

215

     I, <u>Dr. Thomas D. Fowlkes</u>, state that I have read the foregoing deposition and that it is a true and complete transcript of the testimony given by me on Wednesday, May 19, 2020, together with corrections, if any, on the attached errata sheet(s).


_____
     Dr. Thomas D. Fowlkes




COMMONWEALTH OF KENTUCKY

COUNTY OF _____

     Signed before me on this the _____ day of _____.

     My commission expires: _____.


_____
     NOTARY PUBLIC

216

STATE OF KENTUCKY  )

COUNTY OF WOODFORD )


        I, STEPHANIE A. BLANTON, the undersigned

Notary Public in and for the State of Kentucky

at Large, certify that the facts stated in the

caption hereto are true; that at the time and

place stated in said caption, the witness named

in the caption hereto remotely appeared before

me, and that after being by me duly sworn, was

examined by counsel for the parties; that said

testimony was taken down in stenotype by me and

later reduced to computer transcription under my

direction and the foregoing is a true and

accurate record to the best of my knowledge of

the testimony given by said witness.

        No party to said action nor counsel for

said parties requested in writing that said

deposition be signed by the testifying witness.

        My commission expires: November 19, 2020.

        IN TESTIMONY WHEREOF, I have hereunto set

my hand and seal of office on this the 4th day

of June, 2020.

                        __a/k/a Stephanie A. Blanton_____
                        STEPHANIE A. BLANTON, CCR (KY)
                        NOTARY PUBLIC, STATE-AT-LARGE